**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAVID L. GIBSON, et al.,         )
         )
      v.         )     Case No. 06cv1696 (RMU)
THE UNITED STATES NAVY, et al.   )
         )

**PLAINTIFFS' MOTION FOR AN ORDER TRANSFERRING
THIS CASE TO THE NORTHERN DISTRICT OF FLORIDA
UNDER 28 U.S.C. § 1404(a)**

This case was originally filed in the Northern District of Florida and transferred to this

Court upon defendants' motion under 28 U.S.C. § 1404(a). Plaintiffs respectfully move this

Court for an Order transferring the case back to the Northern District of Florida because this is

not a case which could have been brought in the District of Columbia and therefore does not

meet § 1404(a)'s criteria. The Accompanying Memorandum of Points and Authorities in

Support of this motion shows that no attorney could or would bring this case in the District of

Columbia and the transfer here was contrary to the interests of justice and §1404(a). The issues

presented herein appear to be a case of first impression.

         Respectfully submitted,

March 15, 2007         /S/ Arthur A. Schulcz ,Sr.
         ARTHUR A. SCHULCZ, SR.
         D.C. Bar No. 453402
         2521 Drexel Street
         Vienna, VA 22180
         703-645-4010
         FAX: 703-645-401

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAVID L. GIBSON, et al.,         )
         )
       v.         )     Case No. 06cv1696 (RMU)
THE UNITED STATES NAVY, et al.     )
         )

**MEMORANDUM AND POINTS OF AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION TO TRANSFER
THIS CASE TO THE NORTHERN DISTRICT OF FLORIDA
UNDER 28 U.S.C. § 1404(a)**

March 15, 2007

Arthur A. Schulcz, Sr.
D.C. Bar No. 453402
2521 Drexel Street
Vienna, VA 22180
703-645-4010
FAX: 703-645-401

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

# TABLE OF CONTENTS

TABLE OF CONTENTS... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

GLOSSARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

INTRODUCTION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE STATUTE IN QUESTION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL AND FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    The *Gibson* Plaintiffs and the Complaint's Filing. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Gibson's Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    THIS CASE COULD NOT HAVE BEEN BROUGHT IN THE DISTRICT OF
      COLUMBIA BECAUSE NO REASONABLY COMPETENT ATTORNEY WOULD
      BRING IT HERE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    The District of Columbia Is Not a District Where the Case "Might Have Been
          Brought" Since an Attorney Initially Filing This Case in the District of Colombia
          Would Commit Malpractice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.    The District of Columbia's Rules of Professional Conduct do not allow
              an attorney to file this case in this District. . . . . . . . . . . . . . . . . . . . . 11

        2.    Plaintiffs deliberately chose not to bring this litigation in the District of
              Columbia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.    Bringing claims in a district subject to dismissal but viable elsewhere is
              malpractice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    B.    Bringing Plaintiffs' Claims Initially in the District of Columbia Would Violate
          Rule 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

II.  PLAINTIFFS' CONSTITUTIONAL CLAIMS BARRED IN THE DISTRICT OF
     COLUMBIA ARE VIABLE IN OTHER JURISDICTIONS. . . . . . . . . . . . . . . . . . . . . 18

     A.  Granting Discretionary Civic Power to Denominational Representatives Violates
         the Establishment Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     B.  Defendants' Twenty-six Year Religious Preference for Catholic Chaplains on
         Selection Boards Is Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     C.  Chaplains Rating Other Chaplains Is Unconstitutional. . . . . . . . . . . . . . . . . . . . . 21

     D.  Defendants Illegally Provided Board Members with Selection Candidates'
         Denominations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     E.  Denomination Was an Illegal Chaplain Promotion Criteria. . . . . . . . . . . . . . . . . 22

     F.  The Chief of Chaplains or His Deputy Unconstitutionally Serve as Presidents of
         Chaplain Selection Boards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     G.  The Rebuttable Presumption of Regularity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. TRANSFER TO THIS DISTRICT IS CONTRARY TO THE INTERESTS OF
     JUSTICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     A.  The Interest of Justice Must Protect a Plaintiff's Right to Bring His Claims. . . . 25

     B.  The Concept of a "Uniform Federal Law" Is a Fiction That Should Not Trump
         the Importance of Vindicating Constitutional Violations . . . . . . . . . . . . . . . . . . . 30

     C.  Transfer From a District Where Plaintiffs' Claims are Viable to a District
         Where They May Be Dismissed Is Contrary to the Interests of Justice. . . . . . . . . 31

         1.  The same "interest of justice" should apply to diversity and federal
             question cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

         2.  A transfer to the District of Columbia is unjust because its unique laws
             prejudice Plaintiffs' claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     D.  Judicial Economy Should Not Trump Vindication of Constitutional Rights. . . . 40

IV.  THIS CASE'S SPECIAL CIRCUMSTANCES MAKE TRANSFER TO THIS
     DISTRICT UNJUST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ii

V.     IN THE ALTERNATIVE, § 1404(A) VIOLATES PLAINTIFFS' RIGHT TO SEEK
       REDRESS AND DUE PROCESS IF § 1404(a) AUTHORIZES TRANSFER TO A
       COURT WHERE PLAINTIFFS' VIABLE ESTABLISHMENT AND DUE PROCESS
       CLAIMS ARE BARRED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

       A.     Transferred to This District Whose Unique Laws Preclude Raising Establishment
              Clause Claims Valid In Other Circuits Violates Due Process. . . . . . . . . . . . . . . 41

       B.     Transfer to This District Violates Plaintiffs' Right to Petition for Redress of
              Constitutional Violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

EXHIBIT LIST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Adair v. England*, 183 F.Supp.2d 31 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 24

*Adair v. England*, 417 F.Supp.2d 1 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . 3-5, 14, 20, 24, 35, 36

*Adair v. England*, 209 F.R.D. 5 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Adair v. England,* 217 F.Supp.2d 7 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Aderand Constructors, Inc., v. Pena*, 515 U.S. 200 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bd. of Ed. of Kyrias Joel v. Grumet*, 512 U.S. 687 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . 19, 36

*Bounds v. Smith*, 430 U.S. 817 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 43, 44

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). . . . . . . . . . . . . . 43

*Church of Scientology Flag Service Org., Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir.993),
    *cert denied*, 513 U.S. 807 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Committee for Public Education v. Nyquist*, 413 U.S. 756 (1972). . . . . . . . . . . . . . . . 8-10, 19, 33

*County of Allegheny v. ACLU,* 492 U.S. 573 (1989). . . . . . . . . . . . . . . . . . . . . . . . 9, 20, 21, 33, 36

*District of Columbia Hospital Assoc. v. District of Columbia*, 73 F.Supp.2d 8 (D.D.C. 1999). . 16

*Erie Railroad Co. v Tompkins*, 304 U.S. 64 (1938).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ex Parte Milligan*, 71 U.S. 2 (1866). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Ferens v. John Deere Co.*, 494 U.S. 516 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-30, 39, 40

*Goldlawr v. Heiman*, 369 U.S. 463 (1962*)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hernandez v. C.I.R.*, 490 U.S. 680 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Hoffman v. Blaski*, 363 U.S. 335 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 25-27, 34

*Hudson v. Palmer,* 468 U.S. 517 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re England*, 375 F.3d 1169 (D.C. Cir. 2004), *cert denied,* 543 U.S. 152 (2005). . . . . . . 5, 7, 19

*In re Korean Air Lines*, 829 F.2d 1171 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*In re Murchison*,  349 U.S.133 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Nelson*, 873 F.2d 1396 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Sargent*, 136 F.3d 349 (4th Cir), *cert denied sub nom Cox v. Sargent*, 525 U.S. 854
           (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Larkin v. Grendle's Den, Inc.*, 459 U.S. 118 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Larsen v. Valente*, 456 U.S. 428 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Legal Services Corp. v. Valazquez*, 531 U.S. 533 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*Lewis v. Casey*, 518 U.S. 343 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 43

*Perry v. Sindermann*, 408 U.S. 593 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Roeder v. Islamic Republic of Iran*, 195 F.Supp.2d 140 (D.D.C. 2002), *aff'd*, 333 F.3d 228
           (D.C. Cir. 2003), *cert denied*, 542 U.S. 915 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ross v. Moffitt*, 417 U.S. 600 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Rowland v. Fayed*, 115 F.R.D. 605 (D.D.C. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir 1989), *cert denied*, 495 U.S. 932 (1990). . . . . . . . . 17

*Smith v. Haden*, 872 F.Supp. 1040 (D.D.C. 1994), *aff'd* 69 F.3d 606 (D.C. Cir. 1995). . . . . . . . 15

*Spar, Inc. v. Information Resources Inc.*, 956 F.2d 392, 395 (2nd Cir. 1992). . . . . . . . . . . . . . . 40

*Swift v. Tyson*, 16 Pet. 1, 10 L.Ed 1055 (1842). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Trammel v. United States*, 445 U. S. 40 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Brown*, 352 F.3d 654 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Bryan*, 39 U.S. 323 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

v

*Larson v. Valente*, 456 U.S. 228 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Van Dusen v. Barrack*, 376 U.S. 612 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27-30, 32-35

*W. Virginia State Bd of Ed. v. Barnett*, 319 U.S. 624 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Washington v. Davis*, 426 U.S. 229 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Weinberger v. Salfi*, 422 U.S. 749 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Zambrano v. INS*, 972 F.2d, 1122 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Zelman v. Simmons-Harris,* 536 U.S. 639 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATE CASES**

*Breezevale LTD. v Dickenson*, 759 A.2d 627 (D.C. App. 2000). . . . . . . . . . . . . . . . . . . . . . . 15, 16

*In re Spikes*, 881 A.2d 1118 (D.C. App. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Mills v. Cooter*, 647 A.2d 1113 (D.C. App. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Simpson v. Chesapeake & Potomac Tel. Co.*, 522 A.2d 880 (D.C. App. 1987). . . . . . . . . . . 10, 12

*Sun Valley v. Roseholt, Robertson & Tucker*, 981 P.2d 236 (Idaho1999). . . . . . . . . . . . . . . . . 16

**FEDERAL STATUTES**

10 U.S.C. § 612. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

10 U.S.C. § 632. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-39

18 U.S.C. § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

28 U.S.C. 1404(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000. . . . . . . . . . . . . . . . . . . . . 1

**OTHER AUTHORITIES**

District of Columbia's Rules of Professional Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-14

DOD Instruction 1304.28, Guidance for Appointment of Chaplains for the Military
Departments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# GLOSSARY

The following terms and definitions are taken from the Complaint at 71, ¶ 7.c and d.

7.c.  "Non-liturgical" refers to those Christian denominations or faith groups without a formal liturgy or order in their worship service.  In general, they baptize only adults or children who have reached the age of reason, their clergy do not usually wear vestments or special religious dress during services, and they emphasize preaching from the Bible in worship services. Some Navy chaplains refer to these faith groups as "low church".  Baptist, Evangelical, Bible Church, Pentecostal and Charismatic faith groups or churches fall into the non-liturgical Christian category.  Although these faith groups see their tradition and beliefs arising from first century Christianity rather than the Protestant Reformation, the Navy often refers to these faith groups as "non-liturgical Protestant".  The Plaintiffs belong to this category and represent Baptist, Evangelical, Gospel and Bible churches, Pentecostal and other non-liturgical Christian faith groups.

7.d.    Other Definitions/Abbreviations:

CHC - Navy Chaplain Corps
FOS - Failure of Selection - being considered for promotion but not selected.
LT - Lieutenant
LCDR - Lieutenant Commander
CDR - Commander
CAPT - Captain
RADM - Rear Admiral
Career Grades - the ranks (pay grades) of LCDR (O-4), CDR (O-5) and CAPT (O-6)
        whose active duty numbers are controlled by Congress.
DON - Department of Navy (includes the Navy and the Marines)
DODIG - Department of Defense Inspector General

## INTRODUCTION

This Motion seeks an order transferring this case back to the Northern District of Florida where it was originally filed because under 28 U.S.C. § 1404(a).  The District of Columbia is not a district where the complaint could have been originally filed.  To do so would violate Fed. R. Civ. P 11 ("Rule 11") and subject the filing attorney to malpractice and Rule 11 sanctions.  In such a case, the District of Columbia cannot be a district where the action could have been filed initially and the transfer to this Court is contrary to the statute.

## THE STATUTE IN QUESTION

28 U.S.C. § 1404(a) provides in pertinent part:

> for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district ... where it might have been brought.

## PROCEDURAL AND FACTUAL BACKGROUND

### The *Gibson* Plaintiffs and the Complaint's Filing

Plaintiffs are 41 present, retired and former Navy Christian Non-liturgical chaplains (*See* Glossary) and a Christian chaplain endorsing agency suing on behalf of itself and as a representative of its Navy chaplains.  Defendants are the U.S. Navy and  the Secretary of Navy in his official capacity.  On April 28, 2006, these plaintiffs filed suit in the Northern District of Florida (NDFL).  Plaintiffs allege defendants' former and present chaplain promotion systems and practices, selective early retirement ("SER") system, and accession and personnel practices violate the Establishment, Free Speech, Free Exercise and Due Process (Equal Protection Component) Clauses and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000-bb, by preferring Catholic and liturgical Protestant chaplains while prejudicing non-liturgical chaplains.  The chaplain plaintiffs seek certification of a class consisting of all present and

former non-liturgical Navy chaplains who served in the Navy from 1976 to the present who were

allegedly harmed by the Navy's alleged discrimination against non-liturgical Protestant chaplains.

Before addressing the other procedural and statutory issues, the background leading up to

the filing of this case in the NDFL is highly relevant to the question whether the transfer meets §

1404(a)'s standard. At the February 7, 2002, status conference for *Chaplaincy of Full Gospel*

*Churches v. Winter* [the current Secretary of the Navy, originally Danzig, then England], No.

99cv2945, and *Adair v. Winter*, 00-cv566, combined for pre-trial purposes cases,[1] the Court ruled

additional chaplains could join *Adair* as named plaintiffs despite defendants' objections. *Adair*

2/7/02 docket entry following Doc. No. 42, recording the District Court's status hearing decision.

The *Adair* non-liturgical chaplain plaintiffs challenge many of the same Navy promotion,

separation and accession policies challenged here. In June 2002, after completing briefing on

summary judgment and class certification in *Adair*, twenty-three of these 41 chaplain plaintiffs

moved to join *Adair*.[2]  *Adair* Doc. Nos. 52, 54. Despite its earlier approval, this Court denied

the motion to add without prejudice or explanation on 7/16/03. *Adair* Doc. No. 85.

The Court granted the *Adair* plaintiffs' Motion to Certify a Class on 8/19/02, but did not

define the class pending additional briefing. *Adair,* 209 F.R.D. 5, 13 (D.D.C. 2002). That

briefing was immediately provided, Doc. No. 73, 74; *see also* Doc. No. 85, 91, 92 (court's

request for information and parties' responses). A class cannot be certified under Rule 23 until

---

[1] *Adair* and *Chaplaincy of Full Gospel Churches* (*CFGC*) were consolidated for pretrial and discovery purposes. The *CFGC* plaintiffs are a chaplain endorsing agency for Christian Non-liturgical charismatic clergy, and eight of its chaplains.  *CFGC* and *Adair* are still in discovery with issues concerning the scope of discovery still unresolved.

[2] The 17 or 18 potential new *Adair* plaintiffs in February 2002 had grown to 25 by June 2002.

2

the court issues an order defining the class. Almost four years after granting the *Adair* Motion to Certify a class, the *Adair* court had still not provided a class definition or explanation, although the parties' status reports brought this lack of definition to the court's attention.

Four *Adair* plaintiffs were on active duty when they filed their 2002 Motion to Certify a Class. Three had to retire when they reached 20 years because of their failure of selection (FOS) to the grade of commander. The last original active duty plaintiff, CH (LT) Michael Belt, was separated for FOS on March 1, 2006, after the *Adair* Court rejected those plaintiffs' request for a temporary restraining order and an injunction prohibiting his discharge until the Court could rule on the *Adair* plaintiffs' Declaratory Judgment Motion attacking defendants' 26 year preference reserving at least one promotion board membership for Catholic chaplains, a privilege or right provided to no other denomination. *See Adair v. England*, 417 F.Supp.2d 1 (D.D.C. 2006). Consequently, after March 1, 2006, none of the original plaintiffs were able to represent a class of active duty chaplains since none of them were on active duty.[3]

The failure of the *Adair* Court to certify a class before the ability of those plaintiffs to represent actual active duty class members changed has potentially grave consequences for every other chaplain who sought to join the litigation, including the original 25 who requested to join in June 2002 and others who subsequently expressed interest. The law is clear the statute of limitations is tolled while class action certification is pending and the tolling covers all potential members of the class. However, if the class is denied or decertified, future potential plaintiffs

---

[3] An additional *Adair* plaintiff, Ron Tomlin, was a LCDR reservist not on active duty when the *Adair* litigation began. CH Tomlin was promoted to Commander and returned to active duty after successful subsequent litigation in the Federal Claims Court. His promotion and return to active duty, made some of his claims moot. Although he initially said he would continue as a litigant, he has since changed his mind and will shortly be dismissed as an *Adair* plaintiff.

could have serious statute of limitations issues. This potential problem also raises liability issues for the chaplains' attorney since failure to file the suit or find some other alternative to bring them into coverage could give rise to malpractice allegations.

Following CH Belt's discharge, plaintiffs' counsel contacted each of the 25 chaplains who had sought to become plaintiffs in *Adair* in June 2002 and asked them if they were still interested in pursuing their claims and being involved in litigation to address Chaplain Corps (CHC) abuses. Twenty-three of the 25 said "yes." Eighteen other chaplains who had expressed interest in pursuing litigation over the same issues also said yes, after the realities of litigation were explained to them. Declaration of Counsel, Arthur A. Schulcz, ("Schulcz")) Exhibit 1 ¶¶ 17-18. The Associated Gospel Churches, an endorsing agency representing fundamental evangelical chaplains and churches also joined the litigation. *Id.* at ¶¶ 13, 14. Three AGC endorsed Navy chaplains are litigants.

The District of Columbia's Rules of Professional Responsibility (discussed herein) require an attorney to inform his clients of the litigation risks, the strengths and weaknesses of the case, possible obstacles with the local law, and alternatives to achieve his clients' claims for justice. In discussing possible venues for new litigation to protect their rights, counsel made it very clear to all potential plaintiffs that the District of Columbia was not a place where their major claims of bias, prejudice and unconstitutional conduct, particularly in relation to bias in promotion boards, could be raised and adjudicated. For example, plaintiffs' claims that the Establishment Clause is violated by (1) defendants' 26 year practice of reserving promotion board seats for Catholics and only Catholics, and (2) placing denominational representatives on boards which distribute government benefits to or withheld them from other denominational

representatives, without constitutional safeguards, are not viable in the District of Columbia. Schulcz, ¶ 18. *See* II. below. *Adair's* current case law is very clear: chaplains serve on promotion boards as naval officers not as denominational representatives and a presumption of regularity applies to those decisions. *Adair*, 417 F.Supp.2d at 6. Counsel made it very clear to the prospective litigants that: (1) only in the District of Columbia would such a claim be barred; (2) other circuits would apply "strict scrutiny" because of the denominational preference; (3) while the *Adair* holding may eventually be changed through reconsideration or appeal, there is no way to tell when that might be. Schulcz, ¶¶ 18, 20-21. The record is clear the *Adair* Court refused to apply strict scrutiny to a 26 year preference for Catholics, 476 F.Supp.2d at 6. Counsel could find no other case where strict scrutiny has not been applied to such a preference.

Counsel also informed the potential chaplain litigants of other litigation problems in the District of Columbia resulting from *In re England,* 375 F.3d 1169 (D.C. Cir. 2004), *cert denied,* 543 U.S. 152 (2005), which would bar other claims related to selection boards. Counsel informed plaintiffs other Circuits, specifically the Ninth and Eleventh Circuits, have rejected the very rationale on which *In re England* relied to find that Congress intended to hide misconduct on promotion boards. Schulcz at ¶¶ 18, 20-21. A district court within the Ninth Circuit in *Wilkins v. United States,* 99cv, had rejected *In re England's* application to both promotion and SER boards, citing Ninth Circuit precedent. Counsel also informed them of the long decision times within the District of Columbia due to its heavy criminal docket which takes precedence over civil litigation. No potential litigant asked to file their suit in the District of Columbia for obvious reasons. Exposing misconduct and denominational bias is very important to these plaintiffs, some of whom are willing to testify as to denominational preference and the use of

5

religious criteria on promotion boards if allowed to do so. Schulcz, ¶¶ 19, 23. Plaintiffs have told counsel not to file in the District of Columbia. *Id.* at 27, 29; Declaration of LCDR Gary Stewart, Exhibit 2, ¶¶16-22; Declaration of Rev. Dr. George William Baugham, President of Associated Gospel Churches, Exhibit 3, ¶¶ 15-16.

Numerous plaintiffs reside in Florida or California. Although both the Ninth and Eleventh Circuits specifically have rejected *In re England's* rationale and basis, Counsel selected the Eleventh circuit as a venue because of several factors not important to this discussion, including obvious logistical issues. The 23 chaplains this Court rejected as plaintiffs in 2003 joined with 19 other chaplains and an endorsing agency and filed their suit in the NDFL on April 28, 2006, because Eleventh Circuit law allows them to bring claims barred in the District of Columbia.

On May 5, 2006, the *Adair* plaintiffs filed a Motion to Vacate the order approving certification of a class, since the class had never been defined and therefore had never been fully certified as a class. The *Adair* plaintiffs cited their unwillingness and inability to represent the class, due to changed circumstances, including none of the original plaintiffs were on active duty and forced retirements, divorces, etc., which eliminated those plaintiffs' ability to meet their financial obligations as class representatives. The Court granted that motion, eliminating any conflict between potential *Adair* and *Gibson* classes.

### *Gibson's* Procedural History

On 6/1/06 these plaintiffs sought declaratory and partial summary judgment on the constitutionality of defendants' 26 year denominational preference (fiscal year ("FY") 1977 to 2003) reserving at least one chaplain promotion board membership for Catholic chaplains.

*Gibson* Doc. No. 7. The NDFL dismissed the motion without prejudice until defendants appeared.

The federal defendants moved to transfer *Gibson* to this Court under 28 U.S.C. § 1404(a), arguing *Gibson's* claims are similar to those alleged in *CFGC* and *Adai*r. Plaintiffs opposed, arguing *Gibson* is not a case which could have been brought in the District of Columbia because plaintiffs' major claims would be dismissed due to *Adair* or were untenable under *In re England,* 375 F.3d 1169 (D.C.Cir. 2004), *cert denied*, 543 U.S. 152 (2005) (discovery of unconstitutional conduct on promotion boards barred). This made the Motion to Transfer a Motion to Dismiss, not merely a change in courtrooms, contrary to the statute's purpose as explained by the Supreme Court. *See* II.B. and C. *infra*. Plaintiffs also cited the mutually contradictory laws in the Eleventh Circuit and the District of Columbia. Plaintiffs argued they could individually bring their claims in districts or circuits where they each resided but could not and *would not bring* them in the District of Columbia, and an attorney would commit malpractice if he did so.

The U.S. District Court for the Northern District of Florida granted the motion to transfer on August 17, 2006. The U.S. Court of Appeals for the 11th Circuit denied plaintiffs' petition for a writ of mandamus on September 14, 2006. *Gibson* arrived on this Court's docket on September 29, 2006, was assigned to Judge Gladys Kessler with docket no. 1:06cv1696-GK, and was subsequently transferred to Judge Urbina as a case related to *CFGC* and *Adair*. Plaintiffs sought Supreme Court review of the 11th Circuit's denial of mandamus, and the Court denied plaintiffs' petition on January 16, 2007. The case was stayed pending plaintiffs' petition.

Defendants have moved to consolidate *Gibson* for pretrial purposes with *Adair* and *CFGC*. [*CFGC* Doc. No. 243; *Adair* Doc. No.182]. By agreement of the parties, the case had

been stayed.  The Court lifted the stay on 3/1/7 to allow plaintiffs to move to transfer the case

back to the Northern District of Florida where it was originally filed, and plaintiffs now so move.

## STANDARD OF REVIEW

Courts must carefully examine practices "challenged on establishment grounds with a

view to ascertain whether it furthers any of the evils against which that Clause protects."

*Committee for Public Education v. Nyquist*, 413 U.S. 756, 772 (1972).  This should include

examination of whether plaintiffs' right to petition for redress will be denied because of the

transferee court's unique circuit law and law of the case which currently deny plaintiffs' valid

establishment claims.

## SUMMARY OF ARGUMENT

Plaintiffs seek retransfer of their case to NDFL because this District is not a district where

it could have been brought since no competent attorney would file this case here.  Filing this

Complaint in this District would subject the attorney to malpractice and/or Rule 11 sanctions

because the D.C. District Court's and Circuit's unique precedent would result in dismissal of

plaintiffs' major Establishment and Due Process Clause claims.  Congress's use of the phrase

"where [the case] might have been brought" in 28 U.S.C. §1404(a) was intended to address the

ability of an attorney to bring the case without committing malpractice or violating Rule 11

because the ability to file a suit in accord with the local bar rules is an integral and necessary

corollary to bringing a case.

It is not in the interests of justice to transfer a case to a jurisdiction with unique and

dramatically different precedents and case law, subjecting the case's major Establishment and

Due Process Clause claims to dismissal and the attorney to malpractice and Rule 11 violations

8

had he initially filed the case in the transferee district. Such a transfer of a federal question case

clearly contradict the rationale of *Van Dusen v. Barrack*, 376 U.S. 612 (1964), which rejected the

notion that a §1404(a) transfer motion should be the equivalent of a motion to dismiss.

The *Hoffman v. Blaski,* 363 U.S. 335 (1960)*,* and *Van Dusen* rationales intersect with the

Supreme Court's guidance that "our cases require [a] careful examination of any [practice]

challenged on establishment grounds with a view to ascertain whether it furthers any of the evils

against which that Clause protects." *Nyquist*, 413 U.S. at 772; *County of Allegheny v. ACLU*,

492 U.S. 573, 609 (1989) (explaining the judiciary's duty of "unwavering vigilance" against

Establishment Clause violations). This should include examination of whether plaintiffs'

Establishment Clause claims, valid in the transferor court, can be effectively raised in the

transferee court.

Transfer of this action to the District of Columbia, given its case law, effectively denies

plaintiffs protection under the Bill of Rights, specifically (a) denying their right to petition for

redress of constitutional violations; (b) eliminating their right to address government violations

of the Establishment and Due Process Clauses; and (c) the challenged § 1404(a) transfer allows

the fiction of a "uniform federal law" to overrule the reality of vastly different circuit and case

law between the transferor and transferee courts, permitting "judicial economy" to trump

vindication of Establishment Clause violations.

## I.    THIS CASE COULD NOT HAVE BEEN BROUGHT IN THE DISTRICT OF COLUMBIA BECAUSE NO REASONABLY COMPETENT ATTORNEY WOULD BRING IT HERE

*Blaski* addressed the meaning of § 1404(a)'s criteria "where it [the case] might have been

brought" by answering the question "whether a district court in which a civil action has been

properly brought, is empowered by § 1404(a) to transfer the action ... to a district in which the plaintiff did not have a right to bring it." 363 U.S. at 336. The Court's definition of "where it might have been brought" was simple: "if when a suit is commenced plaintiff has a right to sue in that district ... it is a district where the action might have been brought. If he does not have that right, ... it is not a district where it 'might have been brought'...." *Id.* at 344. That describes this case.

A.    **The District of Columbia Is Not a District Where the Case "Might Have Been Brought" Since an Attorney Initially Filing This Case in the District of Colombia Would Commit Malpractice**

The ability to "bring a case" is not independent of the rules governing the attorney who must investigate the facts and the law, draft and file the pleadings fitting the law to the facts, and argue the legal theories, precedents and facts before the tribunal. District of Columbia law raises serious impediments to vindicating plaintiffs' claims and it is the only Circuit and District Court where these limitations exist. *See* II. *infra.* If a competent attorney could not bring suit in the District of Columbia fearing malpractice or violation of Rule 11, it is not a district in which the case might have been brought and therefore does not meet § 1404(a)'s basic criteria. There is no record the NDFL examined the District of Columbia's Rules of Professional Conduct in terms of *Adair*'s law of the case and D.C. Circuit law, or their impact on an attorney's ability to file this case in the District of Columbia. Neither did it evaluate the impact on the public interest and the "interest of justice" in vindicating constitutional claims, *e.g.*, exposing Establishment Clause violations, or damage to the Constitution when the transferee court precludes plaintiffs from arguing constitutional claims valid in any other district.

10

1.    **The District of Columbia's Rules of Professional Conduct do not allow an attorney to file this case in this District**

The application of the District of Columbia's Rules of Professional Conduct ("Prof. Rules") at the time this case was filed show no competent attorney would bring this case in the District of Columbia.  An attorney who did so would risk malpractice because many of plaintiffs' major claims are barred by either the law of the case and/or the law of the Circuit. Filing plaintiffs' Complaint in the District of Columbia violates local Prof. Rules 1.1, "Competence"; 1.3, "Diligence and Zeal"; 2.1, "Advisor"; 3.1, "Meritorious Claims and Contentions"; and 3.2, "Expediting Litigation."  Prof. Rules 1.1, 1.2, 1.3, 2.1, 3.1, 3.2, and 8.4 are at Exhibit 4.

Prof. Rule 1.1 (Exhibit 4, p. I-1) requires an attorney to analyze the district and circuit law applicable to his clients' claims.  This includes *Adair*'s law of the case and the fact  *In re England* bars plaintiffs' claims concerning bias and Establishment and Due Process Clause violations on promotion boards.  Prof. Rule 1.3 requires an attorney "to seek the lawful objectives of a client through reasonably available means permitted by law", id. at 1.3(b).  This includes the obligation "to take whatever lawful and ethical measures are required to vindicate a client's clause or endeavor," *id*. at Comment [1], "to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense, " *id.* at comment [2], and to "give a lawyer's professional opinion as to what the ultimate decisions of the courts would likely be as to the applicable law."  *Id*.  This Rule parallels Rule 3.1 because under this Rule "a lawyer may not institute or defend a proceeding unless the positions taken are not frivolous." *Id.*

11

Prof. Rule 2.1 (Exhibit 4, p. II-1) requires a lawyer to "render candid advice" and inform his clients of both valid and invalid claims, including those which could not be brought due to local and controlling precedent, a responsibility parallel to Rule 11.  *See Simpson v. Chesapeake & Potomac Tel. Co.*, 522 A.2d 880, 883-85 (D.C. App. 1987) (discussing attorney's duty to investigate claim and failure to do so).  Advising about the consequences of pursuing litigation in a specific venue is required under this Rule since it addresses the attorney's duty to provide advice to preclude "substantial adverse legal consequences to the client" resulting from a course of action which the client desires, *i.e.*, initiating litigation.

Prof. Rule 3.1 ( Exhibit 2, p. III-1), "Meritorious Claims and Contentions", is especially applicable in this case  because the Rule precludes an attorney from bringing a proceeding "unless there is a basis for doing so that is not frivolous", and it should be obvious to the competent attorney that when  the law of the case and the law of the Circuit precludes a client's claim, to bring it is to file a frivolous proceeding.  The District Court doesn't have discretion to rule contrary to Circuit Court precedent.  To file an action precluded by Circuit Court precedent with the hope of seeking "reversal of existing law" some time in the distant future when the Circuit has already refused to consider its decision risks sanctions.  *In re Spikes*, 881 A.2d 1118 (D.C. Ct. of Appeals 2005), addressed the application of Rule 3.1 to both bringing frivolous claims and appealing a denial of a frivolous claim.  The court affirmed the D.C. Board of Professional Responsibility's "finding that respondent violated Rule 3.1 by bringing a defamation suit in the face of *consistent and clear case law* holding that an absolute privilege attaches to complaints made to Bar Counsel."  *Id.* at 1119 (emphasis added).  The attorney failed to make an "objective appraisal of merit" before filing, which would have shown his "defamation lawsuit

12

was meritless." *Id.*

Addressing the safe harbor of "a good faith argument for an extension, modification or reversal of existing law," *id.* citing Rule 3.1, the court held "that 'safe harbor' required a position that is reasoned and supported." In this case, that leaves the attorney to argue the law of the case and circuit are wrong and he will seek reversal on appeal. While the district court may change its mind later, a Circuit panel is not authorized to reverse a previous decision and *In re England* denied those petitioners' request for En Banc review. To expect a reversal on a similar claim is not a "reasoned" expectation. In the face of other less risky options, to press forward and bring a suit in this District puts the attorney at risk of malpractice because taking on a lengthy appeal conflicts with common sense, Rule 3.2, Expediting litigation, *see* 2 and 3 below, and Rule 11. *See* B. below.

The Prof. Rules also require the attorney to inform clients of the obvious risks of litigation, their chances of success and defendants' possible defenses. Prof. Rules 1.1, 1.3, 2.1; *see Mills v. Cooter*, 647 A.2d 1113, 1121 (D.C. App. 1994). As shown below, the chances of success on some of plaintiffs' major claims is zero.

Prof. Rules 1.1, 1.3 and 2.1 require an attorney to inform his clients that if he were to bring these plaintiffs' claims in the District of Columbia, the case would be consolidated with *Adair* and *CFGC*, at least for pretrial purposes as defendants have already moved*, and serious legal consequences follow* from consolidation*. With the *Adair* and *In re England* precedents, plaintiffs have zero chance of winning in the District of Columbia on their claims that: (1) the 26 year denominational preference reserving a selection board membership for at least one Catholic violated the Establishment Clause; (2) having chaplains on boards raised First Amendment issues

13

and denominational bias infected the boards; (3) § 612 is unconstitutional as applied; (4) the

identification of a chaplain's faith group to the board violated the Fifth Amendment (if board

personnel can testify, plaintiffs have evidence that denomination determined selections); and (5)

chaplains rating other chaplains violates the First and Fifth Amendments and RFRA.  *See Adair*,

476 F.Supp.2d at 6; *Adair,* 183 F.Supp.2d at 60-61.

Prof. Rule 3.1 specifically addresses this case.  "A lawyer shall not bring ... a proceeding,

or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous

....."  Filing a claim similar to one that has already been dismissed is a "frivolous claim."

## 2.    Plaintiffs deliberately chose not to bring this litigation in the District of Columbia

Plaintiffs' counsel advised plaintiffs against filing in the District of Columbia

because major elements of their case would be dead on arrival and "resurrection" years away

only after a lengthy appeal process because of the *Adair* Court's (a) dismissal of claims that

chaplains on selection boards raised First Amendment issues; (b) holding that the presumption of

regularity trumped strict scrutiny, (c) failure to apply strict scrutiny to obvious denominational

preferences, *e.g.*, 26 year preference for Catholics, *see Adair*, 417 F.Supp.2d at 6-8; *Adair,* 183

F.Supp.2d at 60-62; and (d) the difficulty the law of the case created for vindication of their

rights.  Plaintiffs' counsel also informed them *In re England*'s bar of discovery of promotion

board proceedings precluded vindicating their claims of (a) denominational bias on promotion

boards and (b) Fifth Amendment violations from defendants' abandoned practice of identifying

each board candidate's faith group to the board members in the District of Columbia.  Schulcz at

¶¶ 13-14.  *See* Prof. Rules 2.1 and 3.2.  No rational client informed of the facts and faced with

14

this choice would bring his or her suit in the District of Columbia and some clients specifically instructed counsel not to do so.  Stewart at ¶¶ 16-22, Baugham at ¶¶ 15-16.  To argue otherwise is absurd.

### 3.      Bringing claims in a district subject to dismissal but viable elsewhere is malpractice

A successful legal malpractice claim in the District of Columbia requires a plaintiff prove (1) an attorney-client relationship with the attorney; (2) the existence of a duty on the part of the attorney; (3) the attorney's breach of that duty; and (4) the attorney's failure to perform the duty was the proximate result of damages to plaintiff.  *Smith v. Haden*, 872 F.Supp. 1040, 1044 (D.D.C. 1994), *aff'd,* 69 F.3d 606 (D.C. Cir. 1995).  Minimal research at the time *Gibson* was filed would disclose there were only two cases in federal district courts involving Navy chaplains raising similar claims, both in the District of Columbia.  Those cases in the District of Columbia barred plaintiffs' major claims, but those claims (barred in the District of Columbia) were viable in other jurisdictions.

An attorney in the District of Columbia would breach his duty under the Prof. Rules described in A.1 above by bringing these plaintiffs' suit in a district where he knew (a) the major elements of his clients' case would be dismissed on a motion to dismiss, (b) the Court would not apply strict scrutiny on the major issues because of the existing case law, and (c) discovery was barred on plaintiffs' major claims concerning promotion board misconduct and bias.  This breach of the attorney's duty would be the proximate cause of damage to plaintiffs.  For example, by bringing a claim in the District of Columbia that would be subject to dismissal but viable elsewhere is per se injury to the plaintiff.  *See Breezevale LTD. v Dickenson*, 759 A.2d 627, 634

(D.C. 2000) (attorney malpractice crippled client's ability to get to trial). This is malpractice

under Prof. Rule 8.4 and/or a violation of Rule 11, subjecting the attorney to damages. *Id.*  This

is the rule in other jurisdictions. *See, e.g., Sun Valley v. Roseholt, Robertson & Tucker*,  981 P.2d

236, 240 (Idaho1999) (attorney must undertake "reasonable research of the relevant legal

principles", exercise due care in "investigating the merits of his opponent's position" and must

be familiar with "controlling points of law").

    **B.**    **Bringing Plaintiffs' Claims Initially in the District of Columbia Would
Violate Rule 11**

       Rule 11 mandates that an attorney "make reasonable inquiry" before signing pleadings

and authorizes sanctions "to emphasize the obligations of attorneys to exercise due care in the

preparation and filing of pleadings." *Rowland v. Fayed*, 115 F.R.D. 605, 607 (D.D.C. 1987).

Rule 11 "specifies that [the attorney's signature] constitutes a certificate that the attorney has ...

performed a 'reasonable inquiry' to insure [the pleading] is well grounded in fact and is

warranted by existing law or a good faith argument for a change in the law." *Id.* 608 (citing Rule

11).  Claims raised contrary to precedent or existing law are not "warranted by existing law". *Id.*

at 608.  "Put differently, a legal position violates Rule 11 if it 'has absolutely no chance of

success under the existing precedent.' " *In re* Sargent, 136 F.3d 349, 352 (4th Cir.), (quoting

*Brubaker v. City of Richmond,* 943 F.2d 1363, 1373 (4th Cir.1991))[internal quotes omitted],

*cert denied sub nom, Cox v. Sargent*, 525 U.S. 854 (1998).  *See also District of Columbia*

*Hospital Assoc. v. District of Columbia*, 73 F.Supp.2d 8, 16-17 (D.D.C. 1999) (counsel violated

Rule 11 by supporting "clients inappropriate position ... and presenting a totally baseless legal

position.").  Research shows plaintiffs' major claims are viable everywhere except the District of

Columbia.  For example, there are no precedents indicating other district courts would deny strict

scrutiny to the defendants' 26 year practice of reserving two and then at least one promotion

board seat for a Catholic.

*Saltany v. Reagan*, 886 F.2d 438, 440 (D.C. Cir 1989), *cert denied,* 495 U.S. 932 (1990),

addressed the question whether the district court's finding "[t]he case offered no hope

whatsoever of success, and plaintiffs' attorneys surely knew it" required sanctions for the attorney

under Rule 11.  The D.C. Circuit answered in the affirmative: "We may agree with the district

court that the suit is audacious - that is not sanctionable in itself - but, we do not see how filing a

complaint that 'plaintiffs' attorneys surely knew' had 'no hope whatsoever of success' can be

anything but a violation of Rule 11."  *Id.  Adair's* unique case law and law of the Circuit makes

filing plaintiffs' major claims in this District a violation of Rule 11.  *See, e.g., Roeder v. Islamic*

*Republic of Iran*, 195 F.Supp.2d 140, 185 (D.D.C. 2002), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003),

*cert denied*, 542 U.S. 915 (2004) (citing the attorney's violation of Rule 11 for filing a claim

barred by longstanding precedent, raising arguments contrary to precedent, and other attorney

failures).

One purpose of Rule 11 is to deter the filing of meritless claims. *See* Advisory Committee

Notes on subdivisions (b) and (c) to1993 Amendment (9th ¶).  "The rule continues to require

litigants to 'stop-and-think' before initially making legal or factual contentions.  It also, however,

emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a

position after it is no longer tenable .... " *Id*. (1st ¶).  The Court cannot allow two contradictory

standards to stand at the same time: the first, one that punishes attorneys for violating the Prof.

Rules or Rule 11, the second that ignores the first standard to allow transfer of a case to a district

17

where no competent attorney would bring it because the first standard precludes filing it.  If an attorney risks or commits malpractice or Rule 11 violations if he had initially brought this case in this District, it cannot be a jurisdiction in which the case "could have been brought."

## II.    PLAINTIFFS' CONSTITUTIONAL CLAIMS BARRED IN THE DISTRICT OF COLUMBIA ARE VIABLE IN OTHER JURISDICTIONS

The purpose of the following section is not to reargue or dispute the specific issues identified here, some of which will be raised by the *CFGC* and *Adair* plaintiffs in a later motion for reconsideration.  The purpose is to demonstrate the significant difference in the law between the District of Columbia where this case was transferred and other jurisdictions, *e.g.*, the NDFL.  This issue specifically relates to the questions of whether this District is one where a reasonable attorney could or would have brought the case initially and whether "the interests of justice" are served by transfer of the case to a court where these claims are barred, and where no reasonable attorney would file the case.

Plaintiffs could not have brought their suit in the District of Columbia, the transferee court, because the *unique* law of the District of Columbia bars plaintiffs' most important claims, viable in almost every other jurisdiction *except* the District of Columbia.  Defendants' very purpose in transferring this case to the District of Columbia was to consolidate this case with *Adair*, a motion they have already filed, thereby bringing this case under *Adair*'s unique law of the case and subjecting plaintiffs's constitutional claims, valid in the Eleventh Circuit, to dismissal.  A chart showing "Viability of Claims by Circuit Venue" is at Exhibit 5.

Plaintiffs have evidence supporting and validating each of the claims below which can be developed and presented in the Eleventh Circuit, but not in this Court, where *Adair* has rejected

18

strict scrutiny and *In re England* bars discovery of board misconduct. Transfer to the District of Columbia leads inevitably to the dismissal of many of plaintiffs' claims below, depriving them of their right to petition, and Establishment and Due Process Clause rights.

### A. Granting Discretionary Civic Power to Denominational Representatives Violates the Establishment Clause

Chaplains are hired as denominational representatives. *See* Dept. Of Defense Instruction 1304.28, Guidance for the Appointment of Chaplains, ¶¶ 6 and E2.1.9 (defining a chaplain as a "religious ministry professional" who is "endorsed to represent a Religious Organization and to conduct its religious observances or ceremonies.") (Exhibit 6); *In re England*, 375 F.3d at 1171 (Chaplain is a religious representative). They sit on promotion boards composed of small numbers and vote in secret without accountability. Plaintiffs' statistical evidence shows those denominations whose members serve on promotion boards most often receive more promotions than those whose members serve as board members less frequently. Plaintiffs evidence also suggests that denomination of board members, whether knowingly or unknowingly, impacts the board results. *See* Harald R. Leuba, PhD, "The Siskin Conjecture", Exhibit K to plaintiffs Reply in Support of their Motion for Summary Judgment in *Larsen v. U.S. Navy*, 02-cv2005 (RMU) (*see Larsen* Doc. Nos. 53, 54) (incorporated by reference). Defendants have no effective guarantees "that the delegated power" given to denominational representatives "will be used exclusively for secular, neutral and non-ideological purposes," *Larkin v. Grendle's Den, Inc.*, 459 U.S. 118, 125-26 (1987) (quoting *Nyquist*, 413 U.S. at 780; *see also Bd. of Ed. of Kyrias Joel v. Grumet*, 512 U.S. 687, 698-99 (1994) (discretionary civic power can't be delegated to persons defined by their religious identity or civic and religious power fused). Plaintiffs

19

challenge 10 U.S.C. § 612's constitutionality[4] as applied to Navy Chaplain Corps (small boards

with secret voting) under the First and Fifth Amendments. *Adair v. England*, 183 F.Supp.2d 31,

60-61 (D.D.C. 2002) rejects this claim since it holds chaplains serve on promotion boards as

naval officers, not denominational representatives.

B.    **Defendants' Twenty-six Year Religious Preference for Catholic Chaplains on
       Selection Boards Is Unconstitutional**

Plaintiffs' challenge the Navy's 26 year policy reserving promotion board memberships

for Catholic chaplains, and only Catholic chaplains, on every career grade promotion board.

From FY 1977 to 1986 (10 years), the Navy reserved two chaplain board memberships for

Catholic chaplains on every career grade promotion board.  From early 1986, when a federal

court indicated their practice would violate the Establishment Clause, to FY02 (16 years) the

Navy reserved at least one promotion board membership for Catholic chaplains.  *See* Comp., ¶¶

51, 57-59 and its Exhibit 17 (list of FY77-02 Board members by name and denomination).  Strict

scrutiny would apply to this obvious 26 year denominational preference in every other district,

*see County of Allegheny*, 492 U.S. at 608-09 (strict scrutiny required for practices *suggesting* a

denominational preference), but *Adair*, 183 F.Supp.2d at 60-61, and *Adair*, 417 F.Supp.2d at 6-8,

held that chaplains sit on promotion boards as naval officers, not denominational

representatives.[5]

---

[4]  § 612 requires a board to have at least 5 members, one of whom must be from the category
under consideration.  Until FY2003, a majority of board members were chaplains.

[5]  In opposing the *Adair* plaintiffs' February 2006 declaratory judgment motion on this issue,
defendants argued they *had* to have a Catholic on these boards.  Obviously, if defendants had to
have a Catholic board member, that board member was serving on the board as a denominational
representative, not merely as a "naval officer."  If chaplains served on promotion boards as naval
officers, they would be picked randomly using criteria other than denomination.

C.    **Chaplains Rating Other Chaplains Is Unconstitutional**

Plaintiffs claim "the use of chaplains to rate other chaplains, except in unavoidable circumstances, violates the First and Fifth Amendments." Comp. at 113-16, Count 7, ¶¶ 95-104. Every district except the District of Columbia would apply the rule of *Grumet, Larkin*, *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (explaining three part test), or the reasonable observer standard to the practice, *see, e.g., Zelman v. Simmons-Harris,* 536 U.S. 639, 656 (2002); *County of Allegheny*, 492 U.S. at 620. Plaintiffs' evidence shows some liturgical chaplains have a record of destroying non-liturgical chaplains who served under them while favoring their own denomination's or liturgical chaplains. For example, no evangelical chaplain who served under Catholic CAPT Young at the San Diego Naval Medical Center was promoted. No Non-liturgical chaplain who served at Naples, Italy from 1990 through 2003 under a series of liturgical chaplains has been promoted on active duty the first or second time they were considered. No evangelical chaplains who served under CAPTs BuchMiller or Rock were promoted her on active duty and based on anecdotal evidence, no Pentecostal chaplain who served under CAPT Rock or was considered by a board of which he was a member has been promoted. Despite plaintiffs' evidence, the District of Columbia bars plaintiffs' claim under *Adair's* case law. *See Adair*, 183 F.Supp.2d at 60-61 (dismissing claim).

D.    **Defendants Illegally Provided Board Members with Selection Candidates' Denominations**

Defendants provided promotion board members with the denomination or faith group of every chaplain candidate before the boards until FY 02, *even though denomination is an illegal and impermissible criteria. United States v. Brown*, 352 F.3d 654, 668 (2d Cir. 2003) [citation

21

omitted].  Plaintiffs allege this impermissible denominational criteria  corrupted chaplain

promotion and SER board proceedings resulting in favoritism for liturgical denominations and

bias and prejudice against plaintiffs, *i.e.*, they were not selected for promotion or retention while

liturgical chaplains with inferior records were.  Plaintiffs will be able to show denomination did,

in fact, determine selections if allowed discovery of board personnel.  Defendants terminated this

practice after litigation began in *CFGC* and *Adair*, Comp. ¶¶ 55-56, an acknowledgment by

defendants the practice was suspect.  Although *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265,

291, 357 (1978), held government use of "'suspect classifications' is subject to strict scrutiny",

*see also Aderand Constructors, Inc., v. Pena*, 515 U.S. 200, 227 (1991) (same), *Adair*, 217

F.Supp.2d 7, 12-13 (D.D.C. 2002), held plaintiffs must provide evidence the board members

actually used the provided denominational information to prevail on this claim.  This is

impossible in the District of Columbia given *In re England's* bar on discovery.

### E.    Denomination Was an Illegal Chaplain Promotion Criteria

Plaintiffs allege and have evidence denominational considerations corrupted

chaplain promotion and SER board proceedings resulting in promotion or retention of liturgical

chaplains with inferior records instead of the plaintiffs, in violation of the First and Fifth

Amendments.  These claims depend on evidence that board members used denominational

criteria in selections, *see Washington v. Davis*, 426 U.S. 229, 239-40 (1976), evidence that can

only come from board members or witnesses to the board proceedings.  Such evidence is

available.  *See* Declaration of LCDR Stewart, Exhibit 2, ¶¶ 6-7 (selection of an obese priest with

an inferior record); Declaration of Klon Kitchen and Affidavit of CAPT Ellison at Exhibits 7 and

8 (Protestant chaplain deselected to make room for a Catholic since no Catholic had been

selected) (discussed in III.C.2. *infra*)..

At the time this case was filed, only the District of Columbia barred discovery of promotion board proceedings because of *In re England*. Plaintiffs residing in the Ninth or Eleventh Circuits could have brought these claims there and obtained discovery of board proceedings. In the Eleventh Circuit, *In re Nelson* 873 F.2d 1396, 1397 (11th Cir. 1989) would enable plaintiffs to prove their claims by allowing discovery of promotion and SER board proceedings because no statute provided the specific language necessary to exclude constitutional claims from civil discovery. The Ninth Circuit's discovery law is similar to the Eleventh Circuit's: "The Supreme Court has held that statutes prohibiting general disclosure of information do not bar judicial discovery absent an express prohibition against such disclosure," *Zambrano v. INS*, 972 F.2d, 1122, 1125 (9th Cir. 1992) (citing *In re Nelson* as authority).

The FY2007 defense appropriations bill contains language indicating Congress intended to bar discovery of selection board proceedings in civil litigation. On its face, the new statutory language fails to meet the Supreme Court's standard "that where Congress intends to preclude judicial review of *constitutional claims* its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 ((1988) (emphasis added) (citing *Johnson v. Robison*, 415 U.S. 361, 373 ((1974) *and Weinberger v. Salfi*, 422 U.S. 749 (1975)). The Ninth and Eleventh Circuits would apply *Webster* and *Robison*, *In re England,* 375 F.3d at 1118 n.2, rejected *Webster'*s application to promotion boards despite the *Adair* plaintiffs' constitutional claims.

F.    **The Chief of Chaplains or His Deputy Unconstitutionally Serve as Presidents of Chaplain Selection Boards**

The Chief of Chaplains (the "Chief") or his Deputy, the only Rear Admirals (RADM) in

23

the CHC, alternate as presidents of chaplain selection boards. Plaintiffs allege their unique status and influence, giving them power over chaplains' careers and advancement, has allowed them to improperly influence or manipulate selections. *See* Comp., ¶ 63. Defendants' investigations and other sources indicate these RADMs have abused their power. If discovery of promotion board personnel is allowed, plaintiffs can show the Chiefs and Deputies used and use their positions and power to manipulate or illegally influence chaplain promotion boards. That discovery is barred in the District of Columbia but available in other jurisdictions.

### G.    The Rebuttable Presumption of Regularity

The presumption of regularity is a *rebuttable* presumption in other districts and, although plaintiffs' evidence will rebut that presumption, it is useless in the District of Columbia. In ruling on defendants' 2002 motion to dismiss, *Adair* held that chaplains sit on promotion boards as naval officers, not as the denominational representatives they were hired to be,[6] and the presumption of regularity applies to chaplain selection board personnel and their decisions,183 F.Supp.2d 60-61, making the presumption *irrebuttable*. *See Adair*, 417 F.Supp.2d at 6-8. This law of the case raises the question: when are chaplains denominational representatives as they were hired to be, and when do they shed their religious identity to become "naval officers"? No other District Court applies the presumption of regularity in an irrebuttable manner or has applied

---

[6] DOD Instruction 1304.28, Guidance for Appointment of Chaplains for the Military Departments, Exhibit 6, defines a chaplains as religious ministry professionals ("RMP"), ¶ E2.1.9. "To be considered for appointment to serve as a chaplain, an RMP shall receive an endorsement from a qualified Religious Organization verifying" the RMP is qualified and has a "Statement of Ecclesiastical Endorsement". ¶ 6.1. Endorsement is "[t]he internal process that Religious Organizations use when designating RMPs to represent their Religious Organizations to the Military Departments and confirm the ability of their RMPs to conduct religious observances or ceremonies in a military context," ¶ E2.1.7.

it in a motion to dismiss where, if the allegations in the complaint were taken as true, the board

members could not be acting with regularity.

## III.    TRANSFER TO THIS DISTRICT IS CONTRARY TO THE INTERESTS OF JUSTICE

Section 1404(a)'s purpose was to alleviate the inequity *to defendants* when plaintiffs

selected a civil litigation venue where litigation was unjust because it placed the defendant at a

disadvantage.  *Blaski*, 363 U.S. at 342.  Section 1404(a) establishes three criteria for the transfer

of "any civil action" to another district court: (1) "for the convenience of the parties and

witnesses," (2) "in the interest of justice," and (3) the transferee court must be a district "where it

might have been brought."  The Supreme Court has defined "the interests of justice" in the

context of diversity jurisdiction where the laws of the transferor and transferee district courts

differ, and the law in the transferee district would prejudice a plaintiff if the case were

transferred.  The questions posed here are (1) whether the fiction of a uniform federal law in this

case is consistent with the rationale underlying *Blaski* and *Van Dusen* and established precedent

covering an attorney's duties, malpractice and Rule 11; and (2) whether a theoretical "judicial

economy" trumps prejudice to plaintiffs by depriving them of favorable precedents allowing

pursuit of their Establishment and Due Process claims.

### A.    The Interest of Justice Must Protect a Plaintiff's Right to Bring His Claims

*Blaski* defined the meaning of "where it might have been brought" by answering the

question "whether a district court in which a civil action has been properly brought, is

empowered by § 1404(a) to transfer the action ... to a district in which the plaintiff did not have a

right to bring it."  363 U.S. at 336.  *Blaski's* facts and legal issues are similar to this case,

25

although it involved a case of diversity jurisdiction. *Blaski* addressed a Texas Northern District Court's transfer of a case at the defendants' request to a district in Northern Illinois where a similar case existed but where plaintiffs could not have originally brought it. The plaintiffs objected to the transfer, arguing it did not satisfy §1404(a)'s criteria since they could not have brought it in the transferee court. The Texas District Court granted the transfer and both the Fifth Circuit and the Supreme Court declined to reverse the transfer to Illinois. Once the case was in the transferee court, the *Blaski* plaintiffs moved to transfer the case back to Texas, the original District Court. The Northern Illinois District Court denied the motion but the Seventh Circuit reversed and granted the plaintiffs' mandamus petition. The Seventh Circuit found the case had been improperly transferred because it was not a case that could have been brought in Illinois. *Id*. at 336-37 (procedural history of the case). The Supreme Court granted review and affirmed the transfer back to Texas, holding that the transfer from Texas failed to meet § 1404(a)'s requirements. *Id*. at 342-44.

Blaski held the plain words of the statute showed the transferee court was not a district "where it might have been brought" because the plaintiffs could not have brought their suit in that district and "the power of the district court under § 1404(a) to transfer an action to another district is made to depend not upon the wish ... of the defendant but rather upon *whether the transferee district was one in which the action 'might have been brought' by the plaintiff*." *Id*. at 343-44 (emphasis added). The rule is simple: "if when a suit is commenced plaintiff has a right to sue in that district ... it is a district where the action might have been brought. If he does not have that right, ... it is not a district where it 'might have been brought'...." *Id*. at 344. As shown in I and II above, plaintiffs do not have a right to bring many of their claims in the District of

26

Columbia because (a) they are not viable here and (b) filing them here would violate Rule 11 and subject their attorney to malpractice and/or sanctions.

Subsequent decisions concerning § 1404(a) highlight two important "in the interests of justice" principles at the foundation of *Blaski*'s simple rule. First, the transfer must not hinder the ability and the right of plaintiffs to effectively bring claims because § 1404(a) "required an alternative forum in which plaintiffs might proceed," *id.* at 342 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)). *Van Dusen v. Barrack*, 376 U.S. 612 (1964), emphasized and validated a plaintiff's right and ability to bring his claim *in a favorable forum of his choice*. *Van Dusen* rejected the argument that § 1404(a) could be used to deprive a plaintiff of favorable laws by a transfer to a district whose state laws prejudiced the plaintiffs. *Id.* at 638.

*Van Duesen's* defendants argued which state law applied was irrelevant, *id.* at 618, while plaintiffs argued "a § 1404(a) transfer might result in a prejudicial change in the applicable state law" contrary to the "interests of justice," *id.* at 625, because (a) "they were not qualified to bring" their case in Massachusetts, resulting in dismissal, *id.* at 619; and (b) Massachusetts law restricted remedial damages, *id.* at 626, a fact the Supreme Court verified, *id.* at 627-28 (noting significantly different state laws). *Van Dusen* found the district court which had granted the defendants' transfer motion, like the NDFL in this case, "assumed that transfer to a more convenient forum may be granted on a defendant's motion even though that transfer would seriously prejudice the plaintiff's legal claim." *Id.* at 627. *Van Dusen* rejected this approach: "In such cases a defendant's motion to transfer could be tantamount to a motion to dismiss," *id.* at 630, which describes this case exactly. *See* I and II above.

To preserve the plaintiff's "ability to pursue" his claims under favorable law, *see id.* at

27

636, *Van Dusen* held the substantive law applied to the claims was the transferor court's law, *i.e.*, where the case was brought. *Id.* at 639. As the Supreme Court said in a later § 1404(a) case, "if the applicable law were to change after transfer, the plaintiff's venue privilege and resulting state law advantage could be defeated at the defendant's option." *Ferens v. John Deere Co.*, 494 U.S. 516, 524 (1990) (citing *Van Dusen*, 376 U.S. at 638). Although the Court did not specifically address the issue of a plaintiff's right to petition for redress, *Van Dusen's* rationale and logic implicitly protect that right by ensuring a plaintiff's petition would be heard and not dismissed. *Bounds v. Smith*, 430 U.S. 817, 823 (1977), held "meaningful access to the courts is the touchstone" of the right to petition. This includes the "means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds*, 430 U.S. at 825).

The *Van Dusen* defendants sought transfer because it gave them a lethal advantage over plaintiffs, *i.e.*, the equivalent of a motion to dismiss. 376 U.S. at 360. That is exactly what defendants seek here, dismissal of plaintiffs' viable claims by the application of the transferee court's laws unfavorable to plaintiffs constitutional claims, resulting in their dismissal, thereby defeating plaintiffs' venue privilege.

Although it was not a §1404(a) transfer case, *Goldlawr v. Heiman*, 369 U.S. 463, 466 (1962), involved transfer issues leading the Court to comment that Congress's intent in protecting transfers from dismissal for technical reasons was to remove "whatever obstacles may impede an expeditious ... adjudication of cases and controversies on their merits." Defendants here seek to impede the expeditious adjudication of plaintiffs' constitutional controversies on their merits in a favorable forum, contrary to *Goldlawr's* and *Van Dusen's* principles.

28

The second consistent interest of justice principle flowing from subsequent decisions applying *Blaski*'s principles is that plaintiffs should retain the advantage of the laws of the forum which they have chosen. Section 1404(a) "allowed plaintiffs to retain whatever advantage may flow from the state laws of the forum they have initially selected. There is nothing ... in the language or policy of § 1404(a) to justify its use by defendants to defeat the advantage accruing to plaintiffs who have chosen a forum which, although it was inconvenient, was a proper venue." *Van Dusen,* 376 U.S. at 633-34. The interest of justice meant insuring "the accident of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in a federal court which could not have been achieved in the court of the State where the action was filed." *Id.* at 638. *Van Dusen* concluded, "where the defendants seek transfer, the transferee court must be obligated to apply the state law that would have applied if there had been no change of venue. A change of venue under § 1404(a) generally should be, with respect to state law, *but a change of court rooms*." *Id.* at 639 (emphasis added).

What that means in legal and practical terms is that a plaintiff should not be disadvantaged by a § 1404(a) transfer. *Ferens*, 494 U.S. at 522-23, reemphasized that principle which *Van Dusen* had clearly explained.

> [Section 1404(a)'s] legislative background supports the view that § 1404(a) was not designed to narrow the plaintiff's venue privilege or to defeat the state-law advantages that might accrue from the exercise of this venue privilege but rather the provision was simply to counteract the inconveniences that flowed from the venue statutes by permitting transfer to a convenient federal court. Indeed, an interpretation accepting such a rule would go far to frustrate the remedial purposes of § 1404(a). If a change in the law were in the offing, the parties might well regard the section primarily as a forum-shopping instrument. And, more importantly, courts would at least be reluctant to grant transfers, despite considerations of convenience, if to do so might conceivably prejudice the claim of a plaintiff who initially selected a permissible forum. We believe, therefore,

29

> that both the history and purposes of § 1404(a) indicate that it should be regarded
> as a federal judicial housekeeping measure, dealing with the placement of
> litigation in the federal courts and generally intended, on the basis of convenience
> and fairness, simply to authorize a change of courtrooms."

*Id*. at 523 (quoting *Van Dusen*, 376 U.S. 635-637 (footnotes omitted). Transfer in this case is not merely a change of courtrooms, but a change of the substantive law.

### B.    The Concept of a "Uniform Federal Law" Is a Fiction That Should Not Trump the Importance of Vindicating Constitutional Violations

*Ferens* reiterated that § 1404(a)'s criteria protect plaintiffs in diversity cases from defendants' forum shopping. "An opportunity for forum shopping exists whenever a party has a choice of forums that will apply different laws. The *Van Dusen* policy against forum shopping simply requires us to interpret § 1404(a) in a way that *does not create an opportunity for obtaining a more favorable law by selecting a forum through a transfer of venue*." *Id*. at 527 (emphasis added). The Court's comment about "forum shopping" addressed *defendants*' forum shopping for favorable venues, not plaintiffs.

When a case involving a federal question is transferred from one jurisdiction to another, federal courts have applied the fiction of uniform federal law with the transferee court applying its own circuit's precedent. *In re Korean Air Lines,* 829 F.2d 1171, 1175-76 (D.C. Cir. 1987), explained that *Van Dusen* reflected the need to ensure uniformity in the application of state law regardless of location of the court but did not apply to federal questions because "it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of *what is supposed to be* a unitary federal law." *Id.* at 1175-76 (emphasis added). "Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit." *Id.* at 1176. *Korean Air Lines'* comment about "*what is*

*supposed to be a unitary federal law*" acknowledges the concept of "a unitary federal law" is merely a fiction. *Id*.

None of the *Korean Airlines* type federal question cases addressed this situation where the suit could NOT have been brought because filing the case would subject the attorney to malpractice or Rule 11 sanctions. The very reason this case could not have been brought in the District of Columbia is the stark differences in the jurisdictions' precedents and the liability to an attorney who would attempt to bring such an action. If the case could not have been brought in the transferee district initially, the issue of uniform federal law does not become an issue since the case should not be transferred and any differences in precedent or local law become irrelevant.

None of the "unitary federal law" cases addressed the situation here where transfer from one federal district court to another would be equivalent of a motion to dismiss (because of differences in the district's law), a concept and result *Van Dusen* specifically rejected. None of those cases explain how allowing a result in a federal question case *Van Dusen* specifically rejected in the "interests of justice" can satisfy or be justified by § 1404(a)'s words and history. This case raises those issues.

**C.     Transfer From a District Where Plaintiffs' Claims are Viable to a District Where They May Be Dismissed Is Contrary to the Interests of Justice**

The question before the Court is "What does 'Interests of Justice' mean in the context of plaintiffs' claims of pervasive Establishment and Due Process (equal protection component) Clause violations?" The NDFL's decision would have it mean that transfer to a more convenient forum for the defendant may be granted on a defendant's motion to a district where plaintiffs

would never file suit there themselves, where no competent or reasonable attorney would file it, and where transfer would seriously prejudice the plaintiff's legal claims. *Van Dusen,* 376 U.S. at 627, specifically rejected the last consideration, and directly supports rejecting the other two considerations. In arguing they could not bring suit in Massachusetts, the plaintiffs were arguing implicitly no competent attorney would file a personal damages suit in a place were it could be dismissed, thereby subjecting the attorney to malpractice.

Under the NDFL's implied legal construct, by filing a case in a court in which venue and subject matter jurisdiction are proper and in which there are no impediments to hearing his constitutional claims, a plaintiff loses his First Amendment rights (including petition for redress) to challenge a defendant's unconstitutional practices and procedures because the defendant is fortunate to have a case pending in another venue that denies those rights. In essence, the NDFL has said: (1) plaintiffs' choice of forum, law or rights do not matter; (2) defendants are entitled to a lethal legal bonus by transferring the case to a court where plaintiffs' important constitutional claims will be dismissed; (3) avoiding duplicative litigation is a higher constitutional value than vindicating constitutional rights and forcing the government to obey the Constitution; and (4) plaintiffs waive their right to insist their claims be litigated in a venue they selected where those claims are viable, by filing in a federal court. These results are contrary to Supreme Court precedent concerning Establishment Clause claims, the interests of justice, § 1404(a) purpose and application, and as explained in V below, the right to petition for redress.

First, plaintiffs' claims barred in this District involve the Establishment Clause. The supreme Court has instructed that "our cases require [a] careful examination of any [practice] challenged on establishment grounds with a view to ascertain whether it furthers any of the evils

against which that Clause protects." *Nyquist*, 413 U.S. at 772; *County of Allegheny*, 492 U.S. at 609 (citing the judiciary's role as the Establishment Clause's watchdog). This would imply courts should make sure such claims are not thwarted because of a defendant's good fortune to have a similar case in another jurisdiction where its unique laws bar the plaintiff's claims.  The NDFL's analysis completely ignored the inevitable effect of its decision, *i.e.*, the dismissal in this Court of plaintiffs' valid  Establishment Clause claims, thereby allowing defendants to effectively subvert the Constitution.

Second, transfer of this case to the District of Columbia effectively converts a statute meant  to ensure justice into one that perpetrates injustice.  "Justice must satisfy the appearance of justice."  *In re Murchison*,  349 U.S.133, 136(1955) (quoting *Offutt v. United States,* 348 U.S. 11, 14, (1954)).  It is incompatible with the *Van Dusen* Court's holding that changing venue to a place where the law requires dismissal of  a plaintiff's claims, in effect allowing § 1404(a) to become a motion to dismiss, is contrary to the words of the statute, its purpose, and "the interests of justice."  376 U.S. at 636-38.  Section 1404(a) cannot have one meaning in a diversity case and another in a federal case.

### 1.   The same "interest of justice" should apply to diversity and federal question cases

Section 1404(a)'s language contains no distinction between diversity and federal question cases.  *Van Dusen* and *Blaski* were diversity cases but the same interpretation must apply to the statute's words and purpose absent some hint Congress wanted different rules to apply to federal cases.  The same principles that define the interest of justice and injustice cannot be different in federal questions cases without raising substantial due process and right of petition

issues, *see* IV. *infra*, especially in the context of a potential class action.  *Blaski* rejected an

argument defendants could transfer an action to any venue they wished regardless of whether the

action could have been brought there initially.  "The thesis urged by petitioners not only would

do violence to the plain words of § 1404(a), but would also inject *gross discrimination*."  363

U.S. at 344 (emphasis added).  *Blaski* refused to "ascribe to Congress any such discriminatory

purpose."  *Id*.  *Van Dusen* echoed this holding: "[t]here is nothing ... in the language or policy of

§ 1404(a) to justify its use by defendants to defeat the advantage accruing to plaintiffs who have

chosen a forum which, although it was inconvenient, was a proper venue."  376 U.S. at 633-34.

 *Van Dusen* clearly holds that § 1404(a) is not to be used as a tool of oppression in the

hands of defendants, allowing the transfer of a cases to places where the law requires dismissal of

the plaintiffs' claims.  376 U.S. at 630 ("In such cases a defendant's motion to transfer could be

tantamount to a motion to dismiss").  That describes this case exactly.  *See* II. above.  Defendants

cannot point to any case or statement in legislative history showing Congress intended to enable

defendants in federal question cases to utilize § 1404(a) to achieve a prejudicial advantage over a

plaintiff, a result forbidden in a diversity case.  Arguing Congress has one "interests of justice"

standard for diversity cases but a different, unstated standard for federal questions is contrary to

*Blasksi's* holding concerning Congress's intent, 363 U.S. at 344, and would be absurd.  This

would subject citizens to differing standards of justice depending on whether their claims arise

under federal or state law.  If the "accident" of federal diversity jurisdiction does not enable a

defendant to obtain a prejudicial advantage by a § 1404(a) transfer, surely the accident of "federal

question" jurisdiction does not enable a defendant to obtain that  forbidden objective.

 In *Van Dusen*, the Court found the substantial difference in law between the Pennsylvania

and Massachusetts courts would "result in a prejudicial change in the applicable [] law" contrary to the "interests of justice." 376 U.S. at 625. That is the issue here. *See* A and B above. The fiction of "uniform federal law," *see* II.C.2 *supra*, may be true when there are minor difference between circuit laws, but it is not true here where there are substantial differences and the application of the transferee court's law produces the very prejudice *Blaski* and *Van Dusen* found unacceptable and contrary to the interests and principles of justice. Furthermore, none of the cases addressing "uniform federal law" address the question of Rule 11 sanctions and the prospect of malpractice if an attorney sought to bring claims in the transferee court where the client's major claims are subject to dismissal.

2.    <strong><u>A transfer to the District of Columbia is unjust because its unique laws prejudice Plaintiffs' claims</u></strong>

Plaintiffs deliberately chose not to bring their claims in the District of Columbia because its unique precedents prejudice their ability to vindicate their rights under the Constitution and RFRA. No reasonable attorney would bring their claims here given the state of the law in this District and the availability of other viable forums, many of which have less crowded dockets than this Court's. Review of the implications flowing from this case's transfer show the injustice plaintiffs, the public interest and the Constitution will suffer. The difference in the applicable law in each circuit is illustrated by plaintiffs' 6/1/06, declaratory judgment motion on the constitutionality of defendants' 26 year denominational preference reserving at least one chaplain promotion board membership for Catholic chaplains, which the NDFL dismissed without prejudice until defendants appeared. That *Gibson* motion is similar to the one rejected by *Adair* 417 F.Supp.2d at 6.

35

Exhibit 6 to Plaintiffs' Complaint lists chaplain promotion board members and their denominations from FY 1977 to 2002 and shows a clear denominational preference.  Nothing would prevent strict scrutiny from being applied to the challenged practice in the Eleventh Circuit.  *"Larson* [*v. Valente*, 456 U.S. 228, 245 (1982)] teaches that, when it is claimed that denominational preference exists, the initial inquiry is whether the [practice] facially differentiates among religions.  If such facial preference exists, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971)."  *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989).  *See Grumet*, 512 U.S. at 705 ("Here the benefit flows only to a single sect ....");  *County of Allegheny*, 492 U.S. at 595 (favoritism sends a message to non-adherents they are outsiders).  *County of Allegheny,* 492 U.S. at 608-09 and *Larson* require strict scrutiny.  *Church of Scientology Flag Service Org., Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir.993), *cert denied*, 513 U.S. 807 (1994), reviewed a church's Establishment Clause challenge to a city ordinance requiring disclosure of the use of funds the church solicited.  The Eleventh Circuit applied the rule in *Hernandez*, found no discrimination on the ordinance's face either for or against one sect and then applied *Lemon's* three part test, and found the ordinance unconstitutional.  *Id*. at 1527-42.

*Adair* presents a striking contrast.  The *Adair* Court held the *Adair* plaintiffs had no chance of succeeding on the merits of their declaratory judgment motion attacking defendants' 26 year preference in composing selection boards.  417 F.Supp.2d at 6.  *Adair*'s denial was based on the law of the case: chaplains served on promotion boards as naval officers, not denominational representatives, and the presumption of regularity applied to chaplain promotion boards.  *Id*.  On 9/18/06, the *Adair* Court denied those plaintiffs' declaratory judgment motion.

36

Second, plaintiffs allege that some promotion decisions were based on denominational considerations, a practice the Constitution forbids. The Establishment and Due Process (equal protection component) Clauses absolutely prohibit denomination as a criteria for the award or denial of government benefits, *i.e.*, promotions. Denial of promotion for religious reasons is a double injury because an officer who fails of selection to the next higher grade below the rank of commander is subject to separation under 10 U.S.C. § 632, the fate of *Adair*'s last active duty chaplain, LT Belt. Defendants' selection board procedures impose a veil of secrecy over the selection process. Plaintiffs' evidence shows or suggests this secrecy, including secret voting procedures where one zero vote can ruin a chaplain's career, and lack of accountability has encouraged denominational bias by chaplain board members in chaplain promotion and SER decisions. Three examples illustrate the issue.

Plaintiff (LCDR) Gary Stewart, recorder on the fiscal year (FY) 92 LCDR promotion board, reviewed all the candidates' records, giving him personal knowledge of the strength and quality of the promotion candidates' records. That board selected an obese Catholic whose record was grossly inferior to records of some chaplains not selected for promotion. Declaration of Chaplain Stewart at ¶¶ 3-7, Exhibit 2. Obesity in the military is a serious impediment to promotion. LCDR Stewart is willing to testify whether denomination played a role in that obese Catholic chaplain's selection. Other chaplain board personnel have told counsel they have material and relevant testimony concerning promotion board misconduct and manipulation, and are willing to testify once released from their oath of secrecy and its accompanying threat of retaliation.

The Declaration of Klon K. Kitchen (*CFGC* Plaintiff), ¶¶ 5-6, and Affidavit of CAPT

37

Floyd C. Ellison (*Gibson* Plaintiff), ¶¶ 5-6, Exhibits 7 and 8 respectively, describe two different board members' accounts of the same misconduct that occurred on the FY97 Chaplain Captain promotion board. The two board members, CAPT Anderson on the West Coast and CAPT Bumbry on the East Coast, reported the same incident of board misconduct to other non-board member chaplains. On the West Coast CAPT Anderson reported to CAPT to Ellison while on the Est Coast, CAPT Bumbry reported to Chaplains Kitchen and others that when the Captain board had adjourned, the Catholic board member complained to the board members that no Catholic had been selected and Catholics would greatly complain. The next day, the board reconvened and first, removed a Protestant from the promotion list, and then selected the Catholic from below the zone recommended by the Catholic board member. *Id.* If true, this is a blatant affront to the Constitution and Protestant chaplains, including the one who was deselected on the basis of his denomination. This affront will remain unaddressed if this case remains in the District of Columbia where illegal board proceedings are absolutely protected from discovery and redress.

Plaintiffs' Complaint, ¶ 65a, cites the Naval Inspector General (NIG) and the Department of Defense Inspector General (DOD IG) investigations of misconduct and denominational bias by the FY97-98 Chaplain Commander promotion boards. The DOD IG, at 3-4, concluded that denominational bias "may" have influenced selections in both years.[7] The FY97 board president, RADM Holderby, (1) admitted to the NIG that a Catholic with an inferior record was selected over a Protestant with a perfect record, NIG 2/19/ 98 Interview; (2) explained to the DOD IG the

---

[7] Plaintiffs contend that any well informed observer reviewing all the available evidence would have concluded denominational considerations *were* the cause of some selections to CDR.

board applied "denominational considerations", DOD IG at 24; and (3) admitted the Chaplain

Corps gave priests special treatment. *Id*.

In the Eleventh Circuit, plaintiffs may pursue testimony from board personnel to establish

that denominational bias permeated the selection process in these specific instances as well as

other boards on which plaintiffs have indications of prejudice and misconduct.  If these

allegations and stories are true, defendants violated the Establishment Clause and closed their

eyes to the resulting injustice, a violation of both their duty and the law, *e.g.*, 18 U.S.C. § 4.  The

fact that these incidents occurred or evidence of misconduct exists means nothing in the District

of Columbia because *In re England* bars plaintiffs from pursuing their claims concerning

selection board misconduct.

Did Congress intend § 1404(a) to be a vehicle to deny chaplains the opportunity to

challenge an obvious religious preference and obvious Establishment Clause violation?  Did

Congress intend its phrase "the interest of justice" to allow the irreparable harm and injuries

resulting from this 30 years of religious prejudice and bias to go unaddressed or to be used as a

vehicle to cover up criminal misconduct by dismissing valid constitutional claims and preventing

redress of Constitutional wrongs?  Is there anything in 1404(a)'s legislative history or legal

precedent to indicate that 1404(a) was meant to become a tool for the repression and suppression

of valid Establishment Clause claims?  *Blaski* and *Van Dusen* say "No".  "The legislative history

of § 1404(a) certainly does not justify the rather startling conclusion that [Defendants are entitled

to] 'get a change of law as a bonus for a change of venue.' Indeed, an interpretation accepting

such a rule would go far to frustrate the remedial purposes of § 1404(a)." *Ferens*, 494 U.S. at

523.  *Ferens* held § 1404(a) should be interpreted "in a way that does not create an opportunity

39

for obtaining a more favorable law by selecting a forum through a transfer of venue." *Id.* at 527. That is the result if this Court denies the transfer of this case back to the NDFL, contrary to the rule that courts have a special duty to carefully examine allegations of Establishment Clause violations. The "interests of justice" should include whether the transferee court's unique local law will dismiss such claims.

### D.    Judicial Economy Should Not Trump Vindication of Constitutional Rights

In arguing for transfer, defendants claimed judicial economy was an important consideration in the interests of justice. That is only true when the transfer is not the equivalent of a motion to dismiss or where the transferee court's precedents are unique and deny plaintiffs the opportunity to vindicate their constitutional rights. Section 1404(a)'s criteria is the interests of justice, not injustice and does not mention judicial economy.

## IV.    THIS CASE'S SPECIAL CIRCUMSTANCES MAKE TRANSFER TO THIS DISTRICT UNJUST

After obtaining permission of the *Adair* Court to be added as additional named plaintiffs, 23 of these plaintiffs moved to join *Adair* in June 2002. Defendants opposed and *Adair* denied their motion in August 2003. Defendants now argue plaintiffs must be sent to the very court that rejected their earlier request, a court where they cannot bring all their claims and which has rejected the application of strict scrutiny to a blatant 26 year denominational preference.

The Court's delay in defining the class of chaplains for over three years after approving the plaintiffs motion to certify a class is also troubling. Had the Court approved that class, substitution of representative plaintiffs would be much simpler than filing a new case. When placed in the context of this Court's failure to apply strict scrutiny despite saying it would do so,

40

the Court's actions seem to communicate a message that non-liturgical chaplains are not welcomed here. This does not further the appearance of justice, although there may be and probably are legitimate reasons for all of the above.

Another example of injustice is illustrated in the context of a class action; plaintiffs have asked for class certification. Typically, class members are provided the opportunity to "opt out" and bring an action on their own behalf in a local venue. Here, those who would opt out would be able to pursue the claims barred in the District of Columbia by bringing them in their local jurisdictions. This is another example where plaintiffs are treated differently through the application of a statute that was meant to prevent injustice rather than protect defendants' injustice.

**V.    IN THE ALTERNATIVE, § 1404(A) VIOLATES PLAINTIFFS' RIGHT TO SEEK REDRESS AND DUE PROCESS IF § 1404(a)  AUTHORIZES TRANSFER TO A COURT WHERE PLAINTIFFS' VIABLE ESTABLISHMENT AND DUE PROCESS CLAIMS ARE BARRED**

Transfer of plaintiffs' case to a district in which its constitutional claims, which are viable in other jurisdictions, are barred in this Court violates plaintiffs' First Amendment right to petition to seek redress and Fifth Amendment Right of Equal Protection. As shown in I and II. above, plaintiffs' constitutional claims are viable in any district except the District of Columbia.

**A.    Transferred to This District Whose Unique Laws Preclude Raising Establishment Clause Claims Valid In Other Circuits Violates Due Process**

The Due Process clause has an equal protection component which mandates the government treat similarly situated persons in an equal manner. The government cannot treat citizens differently, allowing one person to exert his right while depriving another of the same right. The transfer of this case to this district does just that. Each of these plaintiffs could raise

their Establishment and Due Process Clause claims in their home districts and circuits. Each

plaintiff would have the right to have strict scrutiny applied to the obvious denominational

preferences in this case. As noted above, the Ninth and Eleventh Circuits reject the rationale

underlying *In re England* and those circuits would most likely refuse to bar discovery of

promotion boards based on recent Title 10 changes because the new language does not contain

the specific language required by *Webster v. Doe*, 486 U.S. 592, 603 ((1988); *Johnson v.

Robison*, 415 U.S. 361, 373 ((1974)*, and *Weinberger v. Salfi*, 422 U.S. 749 (1975). Plaintiffs did

not choose to file in this District because of its significantly different laws which extinguishes

plaintiffs' constitutional rights.

> *Erie Railroad Co. v Tompkins*, 304 U.S. 64 (1938) overturned the long standing rule of

*Swift v. Tyson*, 16 Pet. 1, 10 L.Ed 1055 (1842) concerning the law applied in diversity cases. "If

only a question of statutory construction were involved we should not be prepared to abandon a

doctrine so widely applied throughout nearly a century. But the unconstitutionality of the course

pursued has now been made clear, and compels us to do so." *Erie*, 304 U.S. at 77-78. Due

process considerations formed the basis for overturning Swift.

> *Swift v. Tyson* introduced grave discrimination by noncitizens against citizens. It
> made rights enjoyed under the unwritten 'general law' vary according to whether
> enforcement was sought in the state or in the federal court; and the privilege of
> selecting the court in which the right should be determined was conferred upon the
> noncitizen. Thus, *the doctrine rendered impossible equal protection of the law*. In
> attempting to promote uniformity of law throughout the United States, the doctrine
> had prevented uniformity in the administration of the law of the state. The
> discrimination resulting became in practice far-reaching.

*Id*. at 74-75 (emphasis added). The *Blaski* and *Van Dusen* decisions reinforce that underlying

principle of equal protection for all citizens: the substantive law to be applied did not depend upon

whether the parties were in federal or state court and the plaintiff could determine that by choosing the venue in which he filed suit. "Equal protection ... emphasizes disparity in treatment by the [government] between classes of individuals whose situations are arguably indistinguishable. " *Ross v. Moffitt*, 417 U.S. 600, 609 (1974).

Transfer of this case, to a district where the plaintiffs said not to file it and where the attorney could not file it because of its substantively different law, denies these plaintiffs their right to equal protection of the law.

### B.    Transfer to This District Violates Plaintiffs' Right to Petition for Redress of Constitutional Violations

Transfer of plaintiffs' case to a district in which its constitutional claims viable in other jurisdictions, *see* II. above, are barred violates plaintiffs' First Amendment right to petition to seek redress. "The right of access to the courts is but one aspect of the right to petition." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). However, the right of access must mean an effective and valid opportunity to present viable claims and have them decided on the merits, *i.*e., "a reasonably adequate opportunity to present claimed violations of fundamental rights to the courts." *Bounds*, 430 U.S. at 825; *Lewis*, 518 U.S. at 351.

Implicit in many of the precedents on the availability of evidence for litigants is the presumption that a party seeking redress for Bill of Rights violations must have access to the information necessary to establish those claims. *E.g., United States v. Bryan*, 39 U.S. 323,331 (1950) ("the public ... has a right to every man's evidence"); *Trammel v. United States*, 445 U. S. 40, 50-51 (1980). This fundamental principle goes hand in glove with the Nation's commitment to the rule of law. "The Constitution of the United States is a law for rulers and people, equally in

43

war and in peace, and covers with the shield of its protection all classes of men, at all times, and

under all circumstances." *Ex Parte Milligan*, 71 U.S. 2, 120-121 (1866). The transfer of this case

to this Court, where plaintiffs' are denied the right and ability to effectively challenge open

violations of the Constitution because of its unique law of the case and Circuit precedent, is

inconsistent with the principles that religion has no place in governmental decisions awarding or

denying government benefits, *e.g.*, *Perry v. Sindermann*, 408 U.S. 593 (1992), and Establishment

Clause claims must be examined thoroughly. "The very purpose of a Bill of Rights was to

withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the

reach of majorities and officials and to establish them as legal principles to be applied by the

courts." *W. Virginia State Bd of Ed. v. Barnett,* 319 U.S. 624, 638 (1943).

      As explained above, transfer places Plaintiffs on a different legal footing than all other

citizens in the country. Even prisoners have the right to petition for redress of constitutional

wrongs, *e.g., Hudson v. Palmer,* 468 U.S. 517, 523 (1984); *Bounds*, 430 U.S. at 821.

"Meaningful access to the courts is the touchstone." *Bounds*, 430 U.S. at 823. Navy chaplains

with evidence of denominational considerations influencing promotion board selections are

unable to challenge that process in the District of Columbia, the transferee court. Although any

Plaintiff could have challenged these procedures within his local jurisdiction, *e.g.*, the Ninth and

Eleventh Circuits, they are precluded from doing so here because they sought to take advantage of

combining their similar causes of action and brought them in the Eleventh Circuit, whose laws

allowed them to address these serious violations of the Constitution.

      *Legal Services Corp. v. Valazquez*, 531 U.S. 533 (2001), held that funding restrictions

forbidding challenges to the constitutionality of welfare laws and policies violated the

44

Constitution.  Congress's efforts "to insulate current welfare laws from constitutional scrutiny"

and "the Government's interpretation of the Constitution from judicial challenge" were

unconstitutional.  *Id.* at 547.  A § 1404(a) transfer here produces the same result; a change in

district courts gives defendants a litigation windfall contrary to § 1404(a)'s purposes  as explained

by *Van Dusen*, by insulating their practices from judicial review and disenfranchising plaintiffs

from the Constitution's reach and protections, *e.g.*, their right to petition.  If § 1404(a) allows

transfer of this case from a district where its constitutional claims are viable to a district where

they are not, it must be declared unconstitutional as applied to the facts of this case.

## CONCLUSION

The District of Columbia is not a district in which these plaintiffs could have brought their

suit.  An attorney would have violated Rule 11, committed malpractice,  and/or have been subject

to sanctions.  This is inconsistent with § 1404(a)'s purposes, intent and criteria.  Therefore,

transfer to this Court was improper under § 1404(a)'s criteria, and the case should be transferred

back to the NDFL where it was originally filed.

Respectfully submitted,

March 15, 2007                                  /S/ Arthur A. Schulcz, Sr.
                                               ARTHUR  A. SCHULCZ, SR.,
                                               D.C. Bar No. 453402
                                               Counsel for Plaintiffs
                                               2521 Drexel Street
                                               Vienna, VA 22180
                                                703-645-4010

Of Counsel:
Douglas McKusick, Esq.
THE RUTHERFORD INSTITUTE
P.O. Box 7482
Charlottesville, VA 22906-7482

**EXHIBIT LIST**

| Exhibit No. | Description of Exhibit |
| --- | --- |
| 1 | Declaration of Counsel, Arthur A. Schulcz, Sr. |
| 2 | Declaration of LCDR Gary Stewart |
| 3 | Declaration of Rev. Dr. George William Baugham, President of Associated Gospel Churches |
| 4 | District of Columbia's Rules of Professional Conduct, Rules 1.1, 1.2, 1.3, 2.1, 3.1, 3.2, and 8.4 |
| 5 | Chart showing "Viability of Claims by Circuit Venue" |
| 6 | Dept. Of Defense Instruction 1304.28, Guidance for the Appointment of Chaplains |
| 7 | Declaration of Klon K. Kitchen (*CFGC* Plaintiff) |
| 8 | Affidavit of CAPT Floyd C. Ellison (*Gibson* Plaintiff) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAVID L. GIBSON, et al., | ) | |
| | ) | |
| v. | ) | Case  No. 06cv1696 (RMU) |
| THE UNITED STATES NAVY, et al. | ) | |
| | ) | |

**DECLARATION OF ARTHUR A. SCHULCZ, SR.**

Pursuant to 28 U.S.C. § 1746, I, Arthur A. Schulcz, Sr, declare as follows:

1.      My name is Arthur A. Schulcz, Sr.  I have personal knowledge of and am competent to testify to the matters addressed herein.

2.      I am counsel of record for the plaintiffs in *Gibson v. U.S. Navy*.  I am also counsel of record for two chaplain cases in the District of Columbia, *Chaplaincy of Full Gospel Churches v. Winters* (*CFGC*) (originally v. Danzig, then England) and *Adair v. Winters* (originally Danzig, then England).  These cases have been consolidated for pretrial purposes, including discovery.

3.      *Adair* originally sought class action status.  Numerous chaplains contacted me about joining the litigation after it was filed.  At that time, there were few decisions in *Adair* and *CFGC*.

4.      In June 2002 I moved to add 25 new plaintiffs to *Adair*, a procedure the District Court approved in a 2/7/02 status conference,  *see* Doc. entry following Doc. No. 42 addressing 2/7/02 Status Conference rulings.  This Motion to Add followed completion of briefing on summary judgment and class certification issues, according to the schedule approved by the Court.

5.      The *Adair* Motion to Add briefing discussed the necessity of an adequate pool of plaintiffs to represent and financially support a class action.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID L. GIBSON, et al.,                         )
                                                 )
                    v.                           )
                                                 )     Case  No. 06cv1696 (RMU)
THE UNITED STATES NAVY, et al.                   )
_____)

## DECLARATION  OF  GARY  PAUL  STEWART

Pursuant to 28 U.S.C. § 1746, I, Gary Paul Stewart, declare as follows:

1.      I live at 9420 Morning Walk Drive, Hagerstown, MD.  I am an active duty non-liturgical

chaplain at the grade of Lieutenant Commander currently assigned to Naval Medical Center

Bethesda, MD.  I am competent to testify on and have personal knowledge of the matters

addressed or discussed in this declaration.  I do not waive my attorney-client privilege for other

matters in discussing herein the issues and factors regarding filing this case.

2.      I am a named plaintiff in this case.

3.      I was a recorder on the Fiscal Year 91 Chaplain Staff Corps Lieutenant Commander

Promotion Board (the "Board").

4.      As a recorder, I was responsible for making sure all the chaplain records appearing

before the Board were complete and in order.

5.      This can only be accomplished by reviewing the records to make sure that all the

appropriate information is current and complete, *e.g.*, photos, awards, and reports, and no

improper material is in a chaplain's file.

6.      In doing this, I reviewed all the records of those appearing before the Board.  I was in a

position to have seen the quality of the fitness reports and records of those considered by the

Board, both those selected and not selected.

EXHIBIT 2
06CV1696

7.    I can state without equivocation, and without revealing the "proceedings" of the Board, that the record of one Catholic selected for promotion to Lieutenant Commander was *grossly* inferior to other chaplains who were passed over for promotion, including at least one non-liturgical chaplain who is a named plaintiff in *Adair v. Winter*, No. 00cv566.  In addition, the Catholic chaplain selected with the far inferior record was grossly overweight, a fact well known throughout the Chaplain Corps.

8.    It was made known to me after the Board concluded that this chaplain had been charged with multiple counts of pedophilia while previously stationed in Sigonella, Italy, a fact that was not recorded in his records at the time the Board considered and promoted him to the rank of Lieutenant Commander.

9.    I witnessed the discussion concerning this chaplain and his selection.

10.    I have requested and continue to request  that the Court, as a higher authority, direct the Secretary of the Navy to relieve me of my oath of secrecy so that I can testify publicly to what I witnessed and heard.  I believe it is highly relevant to the issues of misconduct and religious favoritism on chaplain promotion boards and unconstitutional preferences within the United States Navy.  The evidence I will reveal is not available from other, non restricted sources.

11.    I am in no way being compelled to testify on this matter, but desire to testify of my own accord, to preserve a clear conscience, and to protect the Navy and those that serve it from discrimination, prejudice and an arrogance that disregards the rule of law.

12.    I have provided the above information in a previous declaration dated 8/13/04 in *Chaplaincy of Full Gospel Churches v. England, No. 99cv2945* and *Adair v. England*., No. 00cv566.  It still remains my testimony and expresses my passion to testify concerning what I

EXHIBIT 2
06CV1696

witnessed on the Board.

13.     In June 2002, I was one of 25 chaplains who moved the Court to become named plaintiffs in *Adair*, then seeking to become a class action.

14.     Although the Court denied my request to become an *Adair* named plaintiff, I have watched the litigation closely, read the court decisions, held numerous discussions with Mr. Schulcz, the chaplains' counsel, and other litigants and interested chaplains about the *Adair* and *CFGC* cases and the status of their litigation.

15.     I continue to work in other venues to address what I perceive are serious and pervasive problems in the Navy Chaplain Corps, including misconduct and religious prejudice. These venues include working with members of Congress on specific issues appropriate for its oversight, and interviews in public media.

16.     In early 2006 when the Navy discharged the last active duty chaplain in *Adair*, LT Michael Belt, and Mr. Schulcz mentioned the possibility of filing a new case with new active duty chaplains, I readily and enthusiastically volunteered to be a plaintiff with one proviso, that the case not be brought in the District of Columbia.

17.     One of the reasons I would never consent to having a case brought in the District of Columbia is that it's Circuit law does not allow discovery into promotion board proceedings, something I find disturbing as both a citizen and a chaplain.  I cannot believe that Congress would intend to hide misconduct on promotion boards, thereby providing a safe haven for religious or racial discrimination on promotion boards.

18.     I also understand what strict scrutiny is and how the government seldom wins when its actions are reviewed under that standard.  In discussing the various places where we could file this case, I asked Mr. Schulcz if we would be able to apply strict scrutiny there since many of the

EXHIBIT 2
06CV1696

Page 3 of  5

critical issues involve denominational preferences and strict scrutiny would make for short litigation.

19.    I know that the rule of *In re England* barring discovery of board proceedings is not followed in other Circuits because I followed closely Chaplain Ronald Wilkins' litigation in San Diego which addressed that issue.  His court rejected *In re England's* reasoning and rationale based on Ninth Circuit law.  I know Chaplain Wilkins because we have the same endorser, we share the same interest in bringing reform to a Chaplain Corps that has lost its ethical and moral moorings, and we have spoken often about these issues.

20.    Although Mr. Schulcz brought to my attention other problems in pursuing litigation in the District of Columbia such as the ruling in *Adair* that chaplains serve on promotion boards as naval officers and not denominational representatives, a ruling I find totally inconsistent with my experience, and problems associated with *In re England*, I already understood the nature of these difficulties because of my close association with the litigation and the other *Adair* litigants.

21.    As Mr. Schulcz and I discussed various alternative circuits and districts, my concern was that my case be brought in a court that would allow me to share my testimony of what I saw on the board for which I was recorder and allow exposure of every aspect of Chaplain Corps misconduct, discrimination, manipulation, and favoritism.

22.    I make this Declaration to express my disappointment and anger that this case has been transferred to a district in which I never would have consented to having it filed, one in which I directed Mr. Schulcz to make sure we avoided at all costs.

23.    Having talked with other litigants, I know of no one who would consent to bring this case in the District of Columbia, because many of us have stories to tell and they cannot be told or justice obtained in the District of Columbia.  Its unique law is prejudicial to the interests of

EXHIBIT 2
06CV1696

justice and religious freedom.

I make this declaration under the penalty of perjury, it is true and accurate to the best of my ability, and it represents a portion of the testimony I would give if called upon to testify in a court of law. It is limited here due to the oath of secrecy enforced upon me by the Secretary of the Navy.

Dated: March 15, 2007

/S/ Gary Paul Stewart

GARY PAUL STEWART

EXHIBIT 2
06CV1696

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAVID L. GIBSON, et al., | ) | |
| | ) | |
| v. | ) | Case  No. 06cv1696 (RMU) |
| THE UNITED STATES NAVY, et al. | ) | |
| | ) | |

**DECLARATION OF REV. DR. GEORGE WILLIAM ("BILLY") BAUGHAM**

Pursuant to 28 U.S.C. § 1746, I, George William (Billy) Baugham, declare as follows:

1.    I live in Greenville, SC.  I am competent to testify on and have personal knowledge of matters addressed in this declaration.

2.    I am president of the Associated Gospel Churches ("AGC").  AGC is an endorsing agency for both non-liturgical and liturgical evangelical chaplains who adhere to the five fundamental doctrines of the Christian faith.  AGC has been endorsing military chaplains since 1943 and represents about 6 million American citizens in independent churches who adhere to the five fundamental doctrines of the Christian faith.  AGC's offices are located at 209 Pine Knoll Drive,  Greenville, South Carolina 29609.

3.    I have personal knowledge of the issues affecting the chaplain litigation in federal court because several of AGCs' chaplains are plaintiffs and I have discussed the basic issues of Navy Chaplain Corps prejudice against Non-liturgical and evangelical chaplains with those plaintiffs and other AGC chaplains, and other evangelical chaplains and endorsers.

4.    Chaplain (LCDR) Michael Wright is an original plaintiff in *Adair v. Winter*.  CH Wright's supervisors have expressed to me their belief in his outstanding skills as an administrator and chaplain.  Nonetheless, he was not selected for commander while

chaplains rated under him were.

5.    CH Breck Bregel, despite an outstanding record, failed of selection numerous times until

reportedly the Navy eliminated the distinction of above and in zone and reduced the

number of chaplain board members at which time he was then selected to LCDR. This

confirmed to me the basis for his failure of selection was not his record, but his

identification as a fundamental evangelical chaplain.

6.    I was personally involved in a situation involving CH Armando Torralva in Naples, Italy,

which ultimately led to his non-selection.  CH Torralva is now a plaintiff in this suit.

7.    These are only a few of the incidents in which AGC Navy chaplains have suffered

because of the Navy's hostility toward Non-liturgical evangelical chaplains and the faith

communities they represent.

8.    The Associated Gospel Churches (AGC) passed a resolution in 2001 calling on the

Secretary of Navy and the Navy Chaplain Corps to reform itself and eliminate this bias.

That resolution cited the fact that "In the sixty-three-year history of the AGC only three

AGC Navy Chaplains have been promoted to the rank of Commander and only one to the

rank of Captain while none have ever been assigned to a key career-enhancing or

leadership position in the Corps."

9.    AGC's leadership also approved AGC's filing suit on its own behalf and on behalf of its

chaplains to address the Navy's violations of law which have disadvantaged and

prejudiced AGC,. its chaplains and other Non-liturgical chaplains.

10.    I discussed with Arthur A. Schulcz, Sr., these issues in great detail, including the legal

basis and issues for the other chaplain lawsuits, AGC's particular concerns, and sought

his advice as to the best manner in which to vindicate the rights of AGC and its chaplains.

11.     When I suggested joining the *Adair* litigation, Mr. Schulcz explained why AGC and its

chaplains' rights, which were of particular interest to AGC, could not be vindicated in the

District of Columbia due to *Adair's* law of the case and the Circuit law resulting from *In*

*re England*.

12.     AGC is aware of evidence pointing to denominational bias on promotion boards and the

necessity to open the board proceedings to discovery to enable chaplains who have been

harmed by the process to receive redress as well as to expose the abuse and illegality of

the Chaplain Corps' selection board procedures.

13.     AGC does not believe that chaplains should serve as promotion board members unless

there are guarantees that one chaplain board member cannot manipulate the board results

and there is accountability for each member's vote to ensure denominational preference

or bias is not a factor.  Establishment of that principal is an important litigation principle,

one necessary to protect chaplains from denominational bias, intentional and

unintentional.

14.     AGC and its chaplains have been the victims of bias and prejudice from various military

departments and are well aware that merely commissioning a chaplain as an officer does

not remove those biases from a chaplain's personality or his viewpoint towards others

with very different faith perspectives.

15.     For the above reasons, it was very important to AGC that it be able to bring these claims

in a venue where they were viable.  Mr. Schulcz discussed several venues he was

examining.  I left that determination to him with the caveat that we be able to bring our

claims, vindicate the rights of our chaplains, and terminate the abuses which characterize the Navy Chaplain Corps.

16.  I would never agree to bring our suit in the District of Columbia and would never authorize an attorney to file it there.  This would be a waste of time and resources.

17.  This declaration in no way waives AGC's attorney/client privilege for any matter except that specifically addressed in this declaration for the limited purpose of providing testimony that AGC would not bring its suit in the District of Columbia against the Navy over its Chaplain Corp abuses nor authorize an attorney to file one there on its behalf.

*****************

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

March 12, 2007                              ____/S/ George W.Baugham____
                                            George William Baugham

06cv1696
EXHIBIT 3

November 1996

# D.C. RULES OF
# PROFESSIONAL
# CONDUCT



The District of Columbia Bar
1250 H Street, N.W.
Sixth Floor
Washington, DC 20005-5937

EXHIBIT
12

# CONTENTS

COURT ORDER ................................................................................................................................. v

PREFACE ........................................................................................................................................... vii

SCOPE ................................................................................................................................................ ix

TERMINOLOGY ............................................................................................................................... xi

NOTE TO THE READER .................................................................................................................. xiii

CLIENT-LAWYER RELATIONSHIP ................................................................................................ I-1
1.1    COMPETENCE ...................................................................................................................... I-1
1.2    SCOPE OF REPRESENTATION ........................................................................................... I-1
1.3    DILIGENCE AND ZEAL ....................................................................................................... I-3
1.4    COMMUNICATION ............................................................................................................... I-4
1.5    FEES ....................................................................................................................................... I-5
1.6    CONFIDENTIALITY OF INFORMATION ........................................................................... I-7
1.7    CONFLICT OF INTEREST: GENERAL RULE .................................................................... I-12
1.8    CONFLICT OF INTEREST: PROHIBITED TRANSACTIONS ............................................ I-17
1.9    CONFLICT OF INTEREST: FORMER CLIENT ................................................................... I-19
1.10   IMPUTED DISQUALIFICATION: GENERAL RULE .......................................................... I-19
1.11   SUCCESSIVE GOVERNMENT AND PRIVATE EMPLOYMENT ..................................... I-24
1.12   FORMER ARBITRATOR ....................................................................................................... I-26
1.13   ORGANIZATION AS CLIENT ............................................................................................... I-27
1.14   CLIENT UNDER A DISABILITY .......................................................................................... I-28
1.15   SAFEKEEPING PROPERTY ................................................................................................. I-29
1.16   DECLINING OR TERMINATING REPRESENTATION ...................................................... I-30
1.17   TRUST ACCOUNT OVERDRAFT NOTIFICATION .......................................................... I-32

COUNSELOR ..................................................................................................................................... II-1
2.1    ADVISER ................................................................................................................................ II-1
2.2    INTERMEDIARY .................................................................................................................... II-1
2.3    EVALUATION FOR USE BY THIRD PERSONS ................................................................ II-3

ADVOCATE ........................................................................................................................................ III-1
3.1    MERITORIOUS CLAIMS AND CONTENTIONS ................................................................ III-1
3.2    EXPEDITING LITIGATION ................................................................................................... III-1
3.3    CANDOR TOWARD THE TRIBUNAL ................................................................................. III-1
3.4    FAIRNESS TO OPPOSING PARTY AND COUNSEL ........................................................ III-3
3.5    IMPARTIALITY AND DECORUM OF THE TRIBUNAL ................................................... III-4
3.6    TRIAL PUBLICITY ................................................................................................................ III-5
3.7    LAWYER AS WITNESS ......................................................................................................... III-5
3.8    SPECIAL RESPONSIBILITIES OF A PROSECUTOR ........................................................ III-6
3.9    ADVOCATE IN NONADJUDICATIVE PROCEEDINGS .................................................... III-7

TRANSACTIONS WITH PERSONS OTHER THAN CLIENTS ....................................................... IV-1
4.1    TRUTHFULNESS IN STATEMENTS TO OTHERS ............................................................ IV-1
4.2    COMMUNICATION BETWEEN LAWYER AND OPPOSING PARTIES ........................... IV-1
4.3    DEALING WITH UNREPRESENTED PERSON ................................................................... IV-2
4.4    RESPECT FOR RIGHTS OF THIRD PERSONS .................................................................. IV-3

D.C. RULES OF PROFESSIONAL CONDUCT

**LAW FIRMS AND ASSOCIATIONS** ............................................................................................................ **V-1**
5.1    RESPONSIBILITIES OF A PARTNER OR SUPERVISORY LAWYER ................................... V-1
5.2    RESPONSIBILITIES OF A SUBORDINATE LAWYER ....................................................... V-2
5.3    RESPONSIBILITIES REGARDING NONLAWYER ASSISTANTS ...................................... V-2
5.4    PROFESSIONAL INDEPENDENCE OF A LAWYER ......................................................... V-3
5.5    UNAUTHORIZED PRACTICE OF LAW .......................................................................... V-4
5.6    RESTRICTIONS ON RIGHT TO PRACTICE .................................................................... V-4

**PUBLIC SERVICE** ......................................................................................................................... **VI-1**
6.1    PRO BONO PUBLICO SERVICE ..................................................................................... VI-1
6.2    ACCEPTING APPOINTMENTS ...................................................................................... VI-1
6.3    MEMBERSHIP IN LEGAL SERVICES ORGANIZATION ................................................ VI-2
6.4    LAW REFORM ACTIVITIES .......................................................................................... VI-2

**INFORMATION ABOUT LEGAL SERVICES** ................................................................................. **VII-1**
7.1    COMMUNICATIONS CONCERNING A LAWYER'S SERVICES ...................................... VII-1
7.2    (Not Contained in District of Columbia Rules)
7.3    (Not Contained in District of Columbia Rules)
7.4    (Not Contained in District of Columbia Rules)
7.5    FIRM NAMES AND LETTERHEADS ............................................................................... VII-2

**MAINTAINING THE INTEGRITY OF THE PROFESSION** ............................................................... **VIII-1**
8.1    BAR ADMISSION AND DISCIPLINARY MATTERS ........................................................ VIII-1
8.2    (Not Contained in District of Columbia Rules)
8.3    REPORTING PROFESSIONAL MISCONDUCT ................................................................ VIII-1
8.4    MISCONDUCT ............................................................................................................. VIII-2
8.5    DISCIPLINARY AUTHORITY; CHOICE OF LAW .......................................................... VIII-3

**NONDISCRIMINATION BY MEMBERS OF THE BAR** ................................................................... **IX-1**
9.1    DISCRIMINATION IN EMPLOYMENT .......................................................................... IX-1

# CLIENT-LAWYER RELATIONSHIP

## RULE 1.1   COMPETENCE

**(a)  A LAWYER SHALL PROVIDE COMPETENT REPRESENTATION TO A CLIENT. COMPETENT REPRESENTATION REQUIRES THE LEGAL KNOWLEDGE, SKILL, THOROUGHNESS, AND PREPARATION REASONABLY NECESSARY FOR THE REPRESENTATION.**

**(b)  A LAWYER SHALL SERVE A CLIENT WITH SKILL AND CARE COMMENSURATE WITH THAT GENERALLY AFFORDED TO CLIENTS BY OTHER LAWYERS IN SIMILAR MATTERS.**

### COMMENT:

#### Legal Knowledge and Skill

[1]  In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances. One such circumstance would be where the lawyer, by representations made to the client, has led the client reasonably to expect a special level of expertise in the matter undertaken by the lawyer.

[2]  A lawyer need not necessarily have special training or prior experience to handle legal problems of a type with which the lawyer is unfamiliar. A newly admitted lawyer can be as competent as a practitioner with long experience. Some important legal skills, such as the analysis of precedent, the evaluation of evidence, and legal drafting, are required in all legal problems. Perhaps the most fundamental legal skill consists of determining what kind of legal problems a situation may involve, a skill that necessarily transcends any particular specialized knowledge. A lawyer can provide adequate representation in a wholly novel field through necessary study. Competent representation can also be provided through the association of a lawyer of established competence in the field in question.

[3]  In an emergency a lawyer may give advice or assistance in a matter in which the lawyer does not have the skill ordinarily required where referral to or consultation or association with another lawyer would be impractical. Even in an emergency, however, assistance should be limited to that reasonably necessary in the circumstances, for ill-considered action under emergency conditions can jeopardize the client's interest.

[4]  A lawyer may accept representation where the requisite level of competence can be achieved by reasonable preparation. This applies as well to a lawyer who is appointed as counsel for an unrepresented person. *See also* Rule 6.2.

#### Thoroughness and Preparation

[5]  Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation, and continuing attention to the needs of the representation to assure that there is no neglect of such needs. The required attention and preparation are determined in part by what is at stake; major litigation and complex transactions ordinarily require more elaborate treatment than matters of lesser consequence.

#### Maintaining Competence

[6]  To maintain the requisite knowledge and skill, a lawyer should engage in such continuing study and education as may be necessary to maintain competence, taking into account that the learning acquired through a lawyer's practical experience in actual representations may reduce or eliminate the need for special continuing study or education. If a system of peer review has been established, the lawyer should consider making use of it in appropriate circumstances.

## RULE 1.2   SCOPE OF REPRESENTATION

**(a)  A LAWYER SHALL ABIDE BY A CLIENT'S DECISIONS CONCERNING THE OBJECTIVES OF REPRESENTATION, SUBJECT TO PARAGRAPHS (c), (d), AND (e), AND SHALL CONSULT WITH THE CLIENT AS TO THE MEANS BY WHICH THEY ARE TO BE PURSUED. A LAWYER SHALL ABIDE BY A CLIENT'S DECISION WHETHER TO ACCEPT AN OFFER OF SETTLEMENT OF A MATTER. IN A CRIMINAL CASE, THE LAWYER SHALL ABIDE BY THE CLIENT'S DECISION, AFTER CONSULTATION WITH THE LAWYER, AS TO A PLEA TO BE ENTERED, WHETHER TO WAIVE JURY TRIAL, AND WHETHER THE CLIENT WILL TESTIFY.**

**(b)  A LAWYER'S REPRESENTATION OF A CLIENT, INCLUDING REPRESENTATION BY APPOINTMENT, DOES NOT CONSTITUTE AN ENDORSEMENT OF THE CLIENT'S POLITICAL, ECONOMIC, SOCIAL, OR MORAL VIEWS OR ACTIVITIES.**

last clause of paragraph (e) recognizes that determining the validity or interpretation of a statute or regulation may require a course of action involving disobedience of the statute or regulation or of the interpretation placed upon it by governmental authorities.

## RULE 1.3   DILIGENCE AND ZEAL

**(a) A LAWYER SHALL REPRESENT A CLIENT ZEALOUSLY AND DILIGENTLY WITHIN THE BOUNDS OF THE LAW.**

**(b) A LAWYER SHALL NOT INTENTIONALLY:**

**(1) FAIL TO SEEK THE LAWFUL OBJECTIVES OF A CLIENT THROUGH REASONABLY AVAILABLE MEANS PERMITTED BY LAW AND THE DISCIPLINARY RULES; OR**

**(2) PREJUDICE OR DAMAGE A CLIENT DURING THE COURSE OF THE PROFESSIONAL RELATIONSHIP.**

**(c) A LAWYER SHALL ACT WITH REASONABLE PROMPTNESS IN REPRESENTING A CLIENT.**

**COMMENT:**

[1]   The duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law, including the Rules of Professional Conduct and other enforceable professional regulations, such as agency regulations applicable to lawyers practicing before the agency. This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client. However, a lawyer is not bound to press for every advantage that might be realized for a client. A lawyer has professional discretion in determining the means by which a matter should be pursued. *See* Rule 1.2. A lawyer's work load should be controlled so that each matter can be handled adequately.

[2]   This duty derives from the lawyer's membership in a profession that has the duty of assisting members of the public to secure and protect available legal rights and benefits. In our government of laws and not of individuals, each member of our society is entitled to have such member's conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense.

[3]   The bounds of the law in a given case are often difficult to ascertain. The language of legislative enactments and judicial opinions may be uncertain as applied to varying factual situations. The limits and specific meaning of apparently relevant law may be made doubtful by changing or developing constitutional interpretations, ambiguous statutes, or judicial opinions, and changing public and judicial attitudes.

[4]   Where the bounds of law are uncertain, the action of a lawyer may depend on whether the lawyer is serving as advocate or adviser. A lawyer may serve simultaneously as both advocate and adviser, but the two roles are essentially different. In asserting a position on behalf of a client, an advocate for the most part deals with past conduct and must take the facts as the advocate finds them. By contrast, a lawyer serving as adviser primarily assists the client in determining the course of future conduct and relationships. While serving as advocate, a lawyer should resolve in favor of the client doubts as to the bounds of the law, but even when acting as an advocate, a lawyer may not institute or defend a proceeding unless the positions taken are not frivolous. *See* Rule 3.1. In serving a client as adviser, a lawyer, in appropriate circumstances, should give a lawyer's professional opinion as to what the ultimate decisions of the courts would likely be as to the applicable law.

[5]   In the exercise of professional judgment, a lawyer should always act in a manner consistent with the best interests of the client. However, when an action in the best interests of the client seems to be unjust, a lawyer may ask the client for permission to forgo such action. If the lawyer knows that the client expects assistance that is not in accord with the Rules of Professional Conduct or other law, the lawyer must inform the client of the pertinent limitations on the lawyer's conduct. *See* Rule 1.2(e) and (f). Similarly, the lawyer's obligation not to prejudice the interests of the client is subject to the duty of candor toward the tribunal under Rule 3.3 and the duty to expedite litigation under Rule 3.2.

[6]   The duty of a lawyer to represent the client with zeal does not militate against the concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm. Thus, the lawyer's duty to pursue a client's lawful objectives zealously does not prevent the lawyer from acceding to reasonable requests of opposing counsel that do not prejudice the client's rights, being punctual in fulfilling all professional commitments, avoiding offensive tactics, or treating all persons involved in the legal process with courtesy and consideration.

[7]   Perhaps no professional shortcoming is more widely resented by clients than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's

# COUNSELOR

## RULE 2.1  ADVISOR

**IN REPRESENTING A CLIENT, A LAWYER SHALL EXERCISE INDEPENDENT PROFESSIONAL JUDGMENT AND RENDER CANDID ADVICE. IN RENDERING ADVICE, A LAWYER MAY REFER NOT ONLY TO LAW BUT TO OTHER CONSIDERATIONS SUCH AS MORAL, ECONOMIC, SOCIAL, AND POLITICAL FACTORS, THAT MAY BE RELEVANT TO THE CLIENT'S SITUATION.**

COMMENT:

### Scope of Advice

[1]  A client is entitled to straightforward advice expressing the lawyer's honest assessment. Legal advice often involves unpleasant facts and alternatives that a client may be disinclined to confront. In presenting advice, a lawyer endeavors to sustain the client's morale and may put advice in as acceptable a form as honesty permits. However, a lawyer should not be deterred from giving candid advice by the prospect that the advice will be unpalatable to the client.

[2]  Advice couched in narrowly legal terms may be of little value to a client, especially where practical considerations, such as cost or effects on other people, are predominant. Purely technical legal advice, therefore, can sometimes be inadequate. It is proper for a lawyer to refer to relevant moral and ethical considerations in giving advice. Although a lawyer is not a moral advisor as such, moral and ethical considerations impinge upon most legal questions and may decisively influence how the law will be applied.

[3]  A client may expressly or impliedly ask the lawyer for purely technical advice. When such a request is made by a client experienced in legal matters, the lawyer may accept it at face value. When such a request is made by a client inexperienced in legal matters, however, the lawyer's responsibility as advisor may include indicating that more may be involved than strictly legal considerations.

[4]  Matters that go beyond strictly legal questions may also be in the domain of another profession. Family matters can involve problems within the professional competence of psychiatry, clinical psychology, or social work; business matters can involve problems within the competence of the accounting profession or of financial specialists. Where consultation with a professional in another field is itself something a competent lawyer would recommend, the lawyer should make such a recommendation. At the same time, a lawyer's advice at its best often consists of recommending a course of action in the face of conflicting recommendations of experts.

### Offering Advice

[5]  In general, a lawyer is not expected to give advice until asked by the client. However, when a lawyer knows that a client proposes a course of action that is likely to result in substantial adverse legal consequences to the client, duty to the client under Rule 1.4 may require that the lawyer act if the client's course of action is related to the representation. A lawyer ordinarily has no duty to initiate investigation of a client's affairs or to give advice that the client has indicated is unwanted, but a lawyer may initiate advice to a client when doing so appears to be in the client's interest.

## RULE 2.2  INTERMEDIARY

**(a)  A LAWYER MAY ACT AS INTERMEDIARY BETWEEN CLIENTS IF:**

**(1)  THE LAWYER CONSULTS WITH EACH CLIENT CONCERNING THE IMPLICATIONS OF THE COMMON REPRESENTATION, INCLUDING THE ADVANTAGES AND RISKS INVOLVED, AND THE EFFECT ON THE ATTORNEY-CLIENT PRIVILEGES, AND OBTAINS EACH CLIENT'S CONSENT TO THE COMMON REPRESENTATION;**

**(2)  THE LAWYER REASONABLY BELIEVES THAT THE MATTER CAN BE RESOLVED ON TERMS COMPATIBLE WITH THE CLIENTS' BEST INTERESTS, THAT EACH CLIENT WILL BE ABLE TO MAKE ADEQUATELY INFORMED DECISIONS IN THE MATTER, AND THAT THERE IS LITTLE RISK OF MATERIAL PREJUDICE TO THE INTERESTS OF ANY OF THE CLIENTS IF THE CONTEMPLATED RESOLUTION IS UNSUCCESSFUL; AND**

**(3)  THE LAWYER REASONABLY BELIEVES THAT THE COMMON REPRESENTATION CAN BE UNDERTAKEN IMPARTIALLY AND WITHOUT IMPROPER EFFECT ON OTHER RESPONSIBILITIES THE LAWYER HAS TO ANY OF THE CLIENTS.**

**(b)  A LAWYER SHOULD, EXCEPT IN UNUSUAL CIRCUMSTANCES THAT MAY MAKE IT INFEASIBLE, PROVIDE BOTH CLIENTS WITH AN EXPLANATION IN WRITING OF THE RISKS INVOLVED IN THE COMMON REPRESENTATION AND OF THE CIRCUMSTANCES THAT MAY CAUSE SEPARATE**

# ADVOCATE

## RULE 3.1 MERITORIOUS CLAIMS AND CONTENTIONS

A LAWYER SHALL NOT BRING OR DEFEND A PROCEEDING, OR ASSERT OR CONTROVERT AN ISSUE THEREIN, UNLESS THERE IS A BASIS FOR DOING SO THAT IS NOT FRIVOLOUS, WHICH INCLUDES A GOOD-FAITH ARGUMENT FOR AN EXTENSION, MODIFICATION, OR REVERSAL OF EXISTING LAW. A LAWYER FOR THE DEFENDANT IN A CRIMINAL PROCEEDING, OR FOR THE RESPONDENT IN A PROCEEDING THAT COULD RESULT IN INVOLUNTARY INSTITUTIONALIZATION, SHALL, IF THE CLIENT ELECTS TO GO TO TRIAL OR TO A CONTESTED FACT-FINDING HEARING, NEVERTHELESS SO DEFEND THE PROCEEDING AS TO REQUIRE THAT THE GOVERNMENT CARRY ITS BURDEN OF PROOF.

COMMENT:

[1] The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure. The law, both procedural and substantive, establishes the limits within which an advocate may proceed. However, the law is not always clear and never is static. Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change.

[2] The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous if the lawyer is unable either to make a good-faith argument on the merits of the action taken or to support the action taken by a good-faith argument for an extension, modification, or reversal of existing law.

[3] In criminal cases or proceedings in which the respondent can be involuntarily institutionalized, such as juvenile delinquency and civil commitment cases, the lawyer is not only permitted, but is indeed required, to put the government to its proof whenever the client elects to contest adjudication.

## RULE 3.2 EXPEDITING LITIGATION

(a) IN REPRESENTING A CLIENT, A LAWYER SHALL NOT DELAY A PROCEEDING WHEN THE LAWYER KNOWS OR WHEN IT IS OBVIOUS THAT SUCH ACTION WOULD SERVE SOLELY TO HARASS OR MALICIOUSLY INJURE ANOTHER.

(b) A LAWYER SHALL MAKE REASONABLE EFFORTS TO EXPEDITE LITIGATION CONSISTENT WITH THE INTERESTS OF THE CLIENT.

COMMENT:

[1] Dilatory practices bring the administration of justice into disrepute. Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

## RULE 3.3 CANDOR TOWARD THE TRIBUNAL

(a) A LAWYER SHALL NOT KNOWINGLY:

(1) MAKE A FALSE STATEMENT OF MATERIAL FACT OR LAW TO A TRIBUNAL;

(2) COUNSEL OR ASSIST A CLIENT TO ENGAGE IN CONDUCT THAT THE LAWYER KNOWS IS CRIMINAL OR FRAUDULENT, BUT A LAWYER MAY DISCUSS THE LEGAL CONSEQUENCES OF ANY PROPOSED COURSE OF CONDUCT WITH A CLIENT AND MAY COUNSEL OR ASSIST A CLIENT TO MAKE A GOOD-FAITH EFFORT TO DETERMINE THE VALIDITY, SCOPE, MEANING, OR APPLICATION OF THE LAW;

(3) FAIL TO DISCLOSE TO THE TRIBUNAL LEGAL AUTHORITY IN THE CONTROLLING JURISDICTION NOT DISCLOSED BY OPPOSING COUNSEL AND KNOWN TO THE LAWYER TO BE DISPOSITIVE OF A QUESTION AT ISSUE AND DIRECTLY ADVERSE TO THE POSITION OF THE CLIENT; OR

D.C. RULES OF PROFESSIONAL CONDUCT

abuse which does not require reporting to Bar Counsel under this Rule, may nonetheless wish to report the perceived situation to the Lawyer Counseling Committee, operated by the D.C. Bar, which assists lawyers having such problems.

[4] The duty to report professional misconduct does not apply to a lawyer retained to represent a lawyer whose professional conduct is in question. Such a situation is governed by the Rules applicable to the client-lawyer relationship.

[5] Rule 1.6(h) brings within the protections of Rule 1.6 certain types of information gained by lawyers participating in lawyer counseling programs of the D.C. Bar Lawyer Counseling Committee. To the extent information concerning violations of the Rules of Professional Conduct fall within the scope of Rule 1.6(h), a lawyer-counselor would not be required or permitted to inform the "appropriate professional authority" referred to in Rule 8.3. Where disclosure is permissive under Rule 1.6 (see paragraph 1.6(c) for cases of permitted disclosures), discretion to disclose to the "appropriate professional authority" would also exist pursuant to paragraph 8.3(c). *See also* Comment to Rule 1.6, paragraphs [29], [30], and [31].

## RULE 8.4    MISCONDUCT

IT IS PROFESSIONAL MISCONDUCT FOR A LAWYER TO:

(a) **VIOLATE OR ATTEMPT TO VIOLATE THE RULES OF PROFESSIONAL CONDUCT, KNOWINGLY ASSIST OR INDUCE ANOTHER TO DO SO, OR DO SO THROUGH THE ACTS OF ANOTHER;**

(b) **COMMIT A CRIMINAL ACT THAT REFLECTS ADVERSELY ON THE LAWYER'S HONESTY, TRUST-WORTHINESS, OR FITNESS AS A LAWYER IN OTHER RESPECTS;**

(c) **ENGAGE IN CONDUCT INVOLVING DISHON-ESTY, FRAUD, DECEIT, OR MISREPRESENTATION;**

(d) **ENGAGE IN CONDUCT THAT SERIOUSLY INTERFERES WITH THE ADMINISTRATION OF JUS-TICE;**

(e) **STATE OR IMPLY AN ABILITY TO INFLUENCE IMPROPERLY A GOVERNMENT AGENCY OR OFFI-CIAL;**

(f) **KNOWINGLY ASSIST A JUDGE OR JUDICIAL OFFICER IN CONDUCT THAT IS A VIOLATION OF APPLICABLE RULES OF JUDICIAL CONDUCT OR OTHER LAW; OR**

(g) **SEEK OR THREATEN TO SEEK CRIMINAL CHARGES OR DISCIPLINARY CHARGES SOLELY TO OBTAIN AN ADVANTAGE IN A CIVIL MATTER.**

### COMMENT:

[1] Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

[2] Paragraph (d)'s prohibition of conduct that "seriously interferes with the administration of justice" includes conduct proscribed by the previous Code of Professional Responsibility under DR 1-102(A)(5) as "prejudicial to the administration of justice." The extensive case law on that standard, as set forth below, is hereby incorporated into this Rule.

[3] The majority of these cases involve a lawyer's failure to cooperate with Bar Counsel. A lawyer's failure to respond to Bar Counsel's inquiries or subpoenas may constitute misconduct, *see In re Cope*, 455 A.2d 1357 (D.C. 1983); *In re Haupt*, 444 A.2d 317 (D.C. 1982); *In re Lieber*, 442 A.2d 153 (D.C. 1982); *In re Whitlock*, 441 A.2d 989 (D.C. 1982); *In re Spencer*, No. M-112-82 (D.C. June 4, 1982); *In re L. Smith*, No. M-91-82 (D.C. App. Mar. 9, 1982); *In re Walsh*, No. M-70 (81) (D.C. Sept. 25, 1981) *en banc*; *In re Schattman*, No. M-63-81 (D.C. June 2, 1981); *In re Russell*, 424 A.2d 1087 (D.C. 1980); *In re Willcher*, 404 A.2d 185 (D.C. 1979); *In re Carter*, No. D-31-79 (D.C. Oct. 28, 1979); *In re Bush* (Bush II), No. S-58-79 (D.C. Oct. 1, 1979); *In re Tucker*, No. M-13-75/S-56-78 (D.C. Nov. 15, 1978), as may the failure to abide by agreements made with Bar Counsel. *In re Harmon*, M-79-81 (D.C. Dec. 14, 1981) (breaking promise to Bar Counsel to offer complainant refund of fee or vigorous representation constitutes conduct prejudicial to the administration of justice).

[4] A lawyer's failure to appear in court for a scheduled hearing is another common form of conduct deemed prejudicial to the administration of justice. *See In re Evans*, No. M-126-82 (D.C. Dec. 18, 1982); *In re Doud*, Bar Docket No. 442-80 (Sept. 23, 1982); *In re Bush* (Bush III), No. S-58-79/D/39/80 (D.C. Apr. 30, 1980); *In re Molovinsky*, No. M-31-79 (D.C. Aug. 23, 1979). Similarly, failure to obey court orders may con-

**VIABILITY OF CLAIMS BY CIRCUIT COURT VENUE**

| CLAIM | ELEVENTH CIRCUIT | DISTRICT OF COLUMBIA |
|---|---|---|
| 10 U.S.C. § 612 unconstitutional as applied to CHC boards | Valid | Barred |
| 26 year Denominational Preference is Establishment Clause Violation<br><br>**Strict Scrutiny Applies | Valid<br><br>** Yes | No<br><br>** No |
| Chaplains Rating Chaplains Violates 1st & 5th Amendments | Valid | Barred |
| Discovery into Promotion Boards | Valid under *In re Nelson* | Barred by *In re England* |
| Discovery into SER Boards | Valid under *In re Nelson* | Not Yet Decided |
| Use of denominational criteria by promotion boards unconstitutional | Valid under *In re Nelson* | Barred by *In re England* |
| Defendants' Identification of Candidate's Faith Group Violates 1st & 5th Amendments | Valid | Barred<br>*In re England* |
| Chief or Deputy as Board President unconstitutional | Valid | Barred<br>*In re England* |
| CHC practices violate RFRA | Valid | ?? |

**EXHIBIT 6**



# Department of Defense
# INSTRUCTION

NUMBER 1304.28

June 11, 2004

USD(P&R)

SUBJECT: Guidance for the Appointment of Chaplains for the Military Departments

References: (a) DoD Directive 1304.19, "Appointment of Chaplains for the Military
Departments," June 11, 2004
(b) Sections 533(a)(1), 643, 827, 3353(a)(1), 5600(a)(1) of title 10,
United States Code
(c) Assistant Secretary of Defense (Force Management Policy)
Memorandum, "Educational Requirements for Military Chaplain
Applicants," April 2, 2002 (hereby canceled)
(d) Principal Deputy Under Secretary of Defense (Personnel and
Readiness) Memorandum, "Assignment of Chaplains for Military
Service," October 14, 2003 (hereby canceled)
(e) through (i), see enclosure 1

## 1. PURPOSE

This Instruction:

1.1. Implements reference (a) and Section 643 of reference (b).

1.2. Cancels reference (c), (d), and DD Form 2741, "Department of Defense
Ecclesiastical Endorsing Organization Verification/Reverification Information."

1.3. Assigns responsibilities appointing chaplains for the Military Departments and
identifies the educational and ecclesiastical requirements for appointment of military
chaplains.

1.4. Modifies requirements and procedures for Religious Organizations to endorse
religious ministry professionals for the chaplaincy.

1

*DODI 1304.28, June 11, 2004*

1.5.  Implements and establishes the criteria and procedures for the administrative separation and loss of professional qualifications of chaplains of the Military Departments.

## 2. APPLICABILITY AND SCOPE

This Instruction applies to the Office of the Secretary of Defense, the Military Departments, (including the Coast Guard when it is operating as a Military Service in the Navy) the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Defense Agencies, the DoD Field Activities, and all other organizational entities in the Department of Defense (hereafter referred to collectively as the "DoD Components"). The term "Military Departments," as used herein, refers to the Department of the Army, the Department of the Navy, and the Department of the Air Force.  The term "Military Services" as used herein refers to the Army, the Navy, the Air Force, and the Marine Corps.

## 3. DEFINITIONS

Terms used in this Instruction are defined in enclosure 2.

## 4. POLICY

This Instruction implements policy established in reference (a).  The guidance in enclosure 3 shall apply.

## 5. RESPONSIBILITIES

5.1.  The Under Secretary of Defense for Personnel and Readiness shall develop overall policy for the appointment of chaplains to the Military Departments, establish professional qualification requirements for chaplains, and shall ensure Religious Organizations endorsing Religious Ministry Professionals (RMPs) to serve as military chaplains shall maintain all requirements as prescribed in enclosure 3.

5.2.  The Secretaries of the Military Departments shall adhere to DoD policy in sections 4. and 6. of this Instruction to ensure that persons appointed as chaplains meet the minimum professional and educational qualifications prescribed in this Instruction. The Secretaries of the Military Departments may impose additional professional requirements.

*DODI 1304.28, June 11, 2004*

6. <u>PROCEDURES</u>

6.1.  To be considered for appointment to serve as a chaplain, an RMP shall receive an endorsement from a qualified Religious Organization verifying:

6.1.1.  The RMP is a fully qualified RMP of a Religious Organization that meets the administrative requirements of this Instruction.

6.1.2.  An RMP's application shall include the endorsement of the person's ecclesiastical credentials on a DD Form 2088, "Statement of Ecclesiastical Endorsement," (enclosure 6).

6.1.2.1.  If a Religious Organization has not previously endorsed military chaplains, it shall file the administrative documents required by enclosure 3 in conjunction with the endorsement of its first fully qualified RMP in an application for appointment as a chaplain for a Military Department.

6.1.2.2.  The Armed Forces Chaplains Board (AFCB) shall accept the required documents only when the applicable Military Department has determined the RMP is fully qualified in all ways other than ecclesiastical endorsement.  The AFCB shall notify the Military Departments of Religious Organizations that have filed the prerequisite documents and whose packets have been found administratively complete.

6.1.2.3.  The Military Departments may evaluate RMPs from Religious Organizations that are submitting the administrative filing requirements for the first time and are pending determination of the fully qualified status of their prospective chaplain.  The Military Departments shall consult with the AFCB to determine if the administrative requirements are pending acceptance in such cases.

6.1.3.  The RMP is willing to function in a pluralistic environment as defined in this Instruction and to support directly and indirectly the free exercise of religion by all members of the Military Services, their family members, and other persons authorized to be served by the military chaplaincies.

6.1.4.  The RMP has 2 years of religious leadership experience for an active component appointment.  Religious leadership experience shall be compatible with the duties of RMPs in their respective Religious Organization and relevant to the settings of military chaplaincy.

*DODI 1304.28, June 11, 2004*

6.1.5.  The RMP is educationally qualified for appointment as a chaplain.  The educationally qualified applicant shall possess a baccalaureate degree with not less than 120 semester hours (180 quarter hours) from a qualifying educational institution.  The educationally qualified applicant shall also possess a post-baccalaureate graduate degree in the field of theological or related studies from a qualifying educational institution.  A qualifying graduate degree program shall require no fewer than 72 semester hours (108 quarter hours) of graduate-level work.  Related studies may include graduate courses in pastoral counseling, social work, religious administration, and similar disciplines when one-half of the earned graduate credits include topics in general religion, world religions, the practice of religion, theology, religious philosophy, religious ethics, and/or the foundational writings from the applicant's religious tradition.

6.2.  A qualifying RMP-producing educational institution is an accredited college, university, or school of theology listed in the current edition of the American Council on Education (ACE), Accredited Institutions of Post-secondary Education and relevant ACE supplements to that publication (reference (e)), or any unaccredited institution that meets the requirements of subparagraphs 6.2.1. through 6.2.4., below.

6.2.1.  An unaccredited educational institution may obtain designation as a qualifying RMP-producing educational institution for a specific applicant to the chaplaincy who graduated from that educational institution by providing certification from registrars at three accredited educational institutions that maintain programs for the preparation of clergy.  Each registrar shall certify that his or her educational institution would have accepted at least 90 percent of the credit hours earned and courses leading to the awarding of the post-graduate degree in theological or related studies earned by that applicant at the unaccredited educational institution, as of the year of graduation.

*DODI 1304.28, June 11, 2004*

6.2.2.  An unaccredited educational institution may be designated as a qualified RMP-producing educational institution by providing the AFCB certification from the registrars of three different accredited educational institutions that maintain programs for the preparation of RMPs.  Each registrar shall certify the list of the major areas of study that that educational institution would accept at least 90 percent of the credit hours earned by a student who is awarded a post-graduate degree in theological or related studies at the unaccredited educational institution.  A designation as a qualified RMP-producing educational institution may apply to any year in which the unaccredited educational institution produced graduates or the institution may request this designation for a period of up to 5 years.  The unaccredited educational institution shall submit the required documentation no later than the beginning of the academic year if designation for future years is sought.  Applications for renewal of this status shall be for periods not to exceed 5 years.

6.2.3.  The required documentation shall be submitted to the AFCB.  The AFCB shall review and approve the documentation for completeness prior to forwarding to the Office of the Deputy Under Secretary of Defense for Military Personnel Policy for inclusion on the list of qualifying educational institutions for Reserve Officers.  The required documentation shall be sent to the following:  Office of the Under Secretary of Defense for Personnel and Readiness, ATTN:  OUSD(P&R)MPP-AFCB, 4000 Defense Pentagon (Room 2E341), Washington, DC 20301-4000.

6.2.4.  Applications containing the required documentation may also be submitted at any time from unaccredited educational institutions requesting designation as a qualifying educational institution for prior school years.

6.3.  A new DD Form 2088 shall be required at each change of career status, as defined by the Military Departments, to re-endorse the qualifications of the chaplain concerned.

6.4.  Requirements for applicants for the chaplaincy:

6.4.1.  Applicants for appointment as a chaplain shall meet physical standards in accordance with DoD Directive 6130.3 (reference (f)) and be otherwise qualified to serve as a commissioned officer in accordance with reference (b) and DoD Directive 1310.2 (reference (g)).

6.4.2.  Applicants shall affirm that, if appointed, they shall abide by applicable laws, and all applicable regulations, directives, and instructions of the Department of Defense and the Military Department that the appointment is made.

*DODI 1304.28, June 11, 2004*

6.5.  Administrative separation of chaplains upon loss of professional qualifications.   If a chaplain loses ecclesiastical authority to function as an RMP or has ecclesiastical endorsement to serve as a chaplain withdrawn, the appropriate Religious Organization shall provide written notification to the Military Department concerned. Processing for separation in accordance with Section 643 of reference (b) shall be initiated immediately upon such notification.   This Instruction does not preclude separation in accordance with other regulations of the Military Department concerned (i.e., when separation for reasons other than loss of ecclesiastical endorsement is appropriate).

6.5.1.  When a separation action is initiated under this Instruction, the chaplain shall be notified in writing of the following:

6.5.1.1.  The chaplain has a right to consult with military counsel or with civilian counsel obtained at no expense to the Government, and to submit statements in response to the notice.

6.5.1.2.  The chaplain has lost ecclesiastical endorsement.

6.5.1.3.  Under conditions established by the Secretary of the Military Department concerned, the chaplain may:

6.5.1.3.1.  Seek another ecclesiastical endorsement within the time frame allotted by the Military Department involved.

6.5.1.3.2.  Apply for non-chaplain duties with the understanding that the officer shall be discharged voluntarily as a chaplain on one day and appointed in a non-chaplain capacity on the next day.

6.5.1.3.3.  Apply for voluntary retirement, if eligible for such retirement; or

6.5.1.3.4.  Tender a voluntary resignation.

6.5.2.  If a request is not submitted under subparagraph 6.5.1.3., above, or if such a request is disapproved, the chaplain shall be separated with an appropriate discharge.  Chaplains of the Army National Guard and the Air National Guard shall not be administratively separated without the consent of the Governor of the State or territory or his or her designated representative.

*DODI 1304.28, June 11, 2004*

6.5.2.1.  The chaplain shall be provided a reasonable period of time consistent with the policies of the Military Department that the chaplain serves to respond to the notice.  If the chaplain states that action under subparagraph 6.5.1.3., above, is requested, the chaplain shall be notified in writing of the date and manner by which such request shall be submitted.

6.5.2.2.  If the chaplain does not respond to the notice in a timely manner, separation processing shall be completed in accordance with subparagraph 6.5.3., below.

6.5.3.  The Secretary of the Military Department concerned may:

6.5.3.1.  Approve a request for a new ecclesiastical endorsement for a serving chaplain submitted in accordance with this Instruction; or

6.5.3.2.  Approve a voluntary resignation, if tendered, and direct an appropriate discharge; or

6.5.3.3.  Approve a voluntary retirement, if requested by an eligible applicant; or

6.5.3.4.  Approve a request for assignment to non-chaplain duties through voluntary resignation and appointment in accordance with regulations implementing Chapters 36 or 1205 of reference (b); or

6.5.3.5.  Direct an appropriate discharge if an action in subparagraph 6.5.1.3., above, is not requested and/or approved.

6.6.  Visits of Endorsing Agents to military installations in overseas areas are encouraged to enhance the spiritual welfare of military personnel, particularly at seasons of special religious significance.

6.6.1.  Such visits shall keep the religious organization aware of the ministry of the organization's chaplains and the spiritual and religious activities of the military community and permit Ecclesiastical Endorsing Agents to maintain their professional relationships with endorsed chaplains.

6.6.2.  Such visits shall be at the discretion of the commander(s) of the installations involved.

*DODI 1304.28, June 11, 2004*

6.6.3.  The Ecclesiastical Endorsing Agents who visit installations representing their Religious Organizations shall do so at no expense to the Government.  The Ecclesiastical Endorsing Agent shall be afforded protocol privileges appropriate to those of a civilian employee in the grade of GS-15.

6.6.4.  The Military Departments may establish procedures governing the visits of Ecclesiastical Endorsing Agents to overseas installations.  The AFCB may provide administrative assistance in arranging such visits.

6.7.  The chaplain candidate programs exist within the Military Departments for the purpose of familiarizing graduate students of religion with religious support activities in the military environment.  Participants in this program serve as commissioned officers in the Reserve components of the Military Departments.  Chaplain candidates are not authorized to serve as or in place of chaplains.

6.7.1.  Upon successful completion of their academic and religious training, participants in the Chaplain Candidate Programs may seek appointment as chaplains.

6.7.2.  Each Military Department is responsible for implementing this program in accordance with Department-specific policies and regulations.

6.7.3.  At a minimum, applicants and participants in the Chaplain Candidate Program shall:

6.7.3.1.  Be approved by a Religious Organization recognized as able to provide ecclesiastical endorsements for chaplains in accordance with the provisions of this Instruction.

6.7.3.2.  Be a matriculated student in graduate-level degree-granting religious studies programs of qualifying educational institutions.  Such programs and institutions shall comply with criteria in paragraph 6.2. of this Instruction for educational requirements for Chaplains.  Subparagraph 6.2.1. of this Instruction does not apply for chaplain candidates.

6.7.3.3.  Be able to complete educational, ecclesiastical, and professional experience requirements for appointment as chaplains prior to reaching the age limitation for such original appointments, as established by the Military Department to which the applicant is applying.

6.7.3.4.  Be able to meet all other appointment eligibility criteria of the Military Department to which the applicant is applying.

*DODI 1304.28, June 11, 2004*

7.  EFFECTIVE DATE

This Instruction is effective immediately.

Charles S. Abell
**Principal Deputy Under Secretary of Defense
for Personnel and Readiness**

Enclosures - 6
E1.  References, continued
E2.  Definitions
E3.  Administrative Filing Requirements for a Religious Organization Desiring to
Endorse Religious Ministry Professionals for the Military Chaplaincy
E4.  Format for Providing Required Information to Meet Administrative
Requirements to Endorse Chaplains to the Military Departments
E5.  Format for Providing Required Information to Endorse RMPs as Chaplains to
the Military Departments
E6.  DD Form 2088, "Statement of Ecclesiastical Endorsement"

*DODI 1304.28, June 11, 2004*

E1.  <u>ENCLOSURE 1</u>

<u>REFERENCES</u>, continued

(e)  American Council on Education, "Accredited Institutions of Post Secondary Education," current edition

(f)  DoD Directive 6130.3, "Physical Standards for Appointment, Enlistment, and Induction," December 15, 2000

(g)  DoD Directive 1310.2, "Appointing Commissioned Officers," May 28, 1996

(h)  DoD Directive 5120.8, "Armed Forces Chaplains Board Charter," March 20, 1995

(i)  Section 501(c)(3) of the title 26, United States Code (Internal Revenue Code)

*DODI 1304.28, June 11, 2004*

E2.  ENCLOSURE 2

DEFINITIONS

E2.1.  TERMS

Terms used in this Instruction are defined as follows:

E2.1.1.  Change of Career Status.  Includes, but is not limited to, initial application for the chaplaincy, change from Reserve to active status or the opposite, and extension on active duty beyond the initial obligated period of service.  This term is further defined by the various Military Services.  A change of career status requires endorsement or re-endorsement by the Religious Organization endorsing the chaplain.

E2.1.2.  Chaplain.  A commissioned officer of the Chaplain Corps of the Army, a commissioned officer of the Chaplain Corps of the Navy, or a commissioned officer in the Air Force designated for duty as a chaplain.

E2.1.3.  Counsel.  A lawyer qualified under Section 827 of title 10, United States Code (Article 27(b)(1) of the Uniform Code of Military Justice) (reference (b)) or a civilian lawyer retained at no expense to the Government.

E2.1.4.  Ecclesiastical.  The forms and practices related to Religious Organizations.

E2.1.5.  Ecclesiastical Endorsement.  Written documentation from a Religious Organization that complies with the administrative requirements of this Instruction that an applicant for the military chaplaincy is fully and professionally qualified and endorsed to perform all offices, functions, sacraments, ordinances, and ceremonies required of a RMP for that Religious Organization, and is capable and authorized to minister as required within a pluralistic environment.

E2.1.6.  Ecclesiastical Endorsing Agent.  An individual authorized to provide or withdraw Ecclesiastical Endorsements on behalf of a Religious Organization.

E2.1.7.  Endorsement.  The internal process that Religious Organizations use when designating RMPs to represent their Religious Organizations to the Military Departments and confirm the ability of their RMPs to conduct religious observances or ceremonies in a military context.

E2.1.8.  Pluralistic Environment.  A descriptor of the military context of ministry. A plurality of religious traditions exist side-by-side in the military.

*DODI 1304.28, June 11, 2004*

E2.1.9.  <u>Religious Ministry Professional (RMP)</u>.  An individual endorsed to represent a Religious Organization and to conduct its religious observances or ceremonies.  An RMP is a fully qualified member of the clergy for those Religious Organizations that have a tradition of professional clergy or their equivalents.  The Religious Organization's endorsement verifies that an RMP is professionally qualified to serve as a chaplain in the military and meets the graduate education and religious leadership requirements of this Instruction.

E2.1.10.  <u>Religious Organization</u>.  An entity that is organized and functions primarily to perform religious ministries to a non-military lay constituency and that has met the religious purposes test of Section 501(c)(3) of title 26, United States Code (reference (i)), and holds current status as a Section 501(c)(3) Schedule "A" organization.  Religious Organizations possess ecclesiastical authority to endorse and withdraw endorsement for Religious Ministry Professionals serving under their authority.

E2.1.11.  <u>Separation</u>.  Discharge or retirement from military service.

ENCLOSURE 2

*DODI 1304.28, June 11, 2004*

E3.  ENCLOSURE 3

ADMINISTRATIVE FILING REQUIREMENTS FOR A RELIGIOUS ORGANIZATION DESIRING TO ENDORSE RELIGIOUS MINISTRY PROFESSIONALS FOR THE MILITARY CHAPLAINCY

E3.1.1.  Religious Organizations that choose to participate in the Military Chaplaincies recognize the chaplaincies of the Military Departments serve a religiously diverse population and that military commanders are required to provide comprehensive religious support to all authorized individuals within their areas of responsibility. Religious Organizations participating in the military chaplaincies therefore express willingness for their RMPs to perform their professional duties as Chaplains in cooperation with Chaplains from other religious traditions and that:

E3.1.1.1.  Chaplains shall wear the appropriate insignia in accordance with uniform regulations of their respective Military Services.

E3.1.1.2.  The Religious Organization shall complete and maintain all administrative requirements of this Instruction (enclosure 3) as a prerequisite to being able to endorse applicants for the chaplaincies.

E3.1.1.3.  Endorsement by a Religious Organization meeting the administrative qualifications of this Instruction (enclosure 3) is an essential element of a chaplain's professional qualifications.   A chaplain whose endorsement is withdrawn shall be processed for separation in accordance with paragraph 6.5.

E3.1.2.  A Religious Organization desiring to provide an RMP to serve as a chaplain in the Military Departments shall meet the administrative filing requirements of this Instruction and maintain the required information for that purpose on file with the Department of Defense.   The Religious Organization shall submit the required documentation to the AFCB in the format specified in enclosure 4.   Submission of the required documents may be made through secure and verified electronic media.   The Religious Organization shall be able to submit documents to permit endorsement of chaplains for the first time only when they are endorsing a fully and professionally qualified candidate, without requirement for waivers of the standards specified by the applicable Military Department.   See paragraph 6.1.

E3.1.3.  The Religious Organization shall submit documents verifying the following information with regard to such organization:

*DODI 1304.28, June 11, 2004*

E3.1.3.1.  That the Religious Organization is organized as an entity functioning primarily to perform religious ministries to a non-military lay constituency and currently holds a Section 501(c)(3) exempt status (reference (i)) as a church for Federal tax purposes from the Internal Revenue Service (IRS) (note "church" is used by the IRS not to denote a belief system, but to distinguish "churches" from other types of religious organizations; see IRS Instructions for Form 1023 Schedule A).  Such rules stipulate that the particular religious beliefs of the organization are truly and sincerely held and that the practices and rituals associated with the organization's religious belief or creed are not illegal or contrary to clearly defined public policy.   In order to determine whether a particular Religious Organization has properly acquired, and currently maintains, an IRS tax exempt status and does not engage in practices that are illegal or contrary to defined public policy, the USD(PR) shall take appropriate steps to verify with the DoD Components and other Federal Agencies compliance with these requirements.

E3.1.3.2.  That it possesses ecclesiastical authority to grant and withdraw initial and subsequent ecclesiastical endorsement for ministry in the Armed Forces.

E3.1.3.3.  That it verifies the Religious Organization shall provide chaplains who shall function in a pluralistic environment, as defined in this Instruction, and who shall support directly and indirectly the free exercise of religion by all members of the Military Services, their family members, and other persons authorized to be served by the military chaplaincies.

E3.1.3.4.  That it agrees to abide by all DoD Directives, Instructions, and other guidance and with Military Department regulations and policies on the qualification and endorsement of RMPs for service as military chaplains.

E3.1.4.  The Religious Organization shall supply the name, title, mailing address, electronic contact, the Employer Identification Number assigned to the organization by the IRS, and telephone number of the agent authorized to represent the Religious Organization to the Military Departments to include authority to grant and withdraw ecclesiastical endorsements.  This agent may not be a currently serving military Chaplain (active duty, National Guard, or Reserve).

E3.1.5.  A Religious Organization shall immediately notify the AFCB when changes occur in the status of the organization, designated endorsing agent, or the contact addresses and telephone numbers of either.

E3.1.6.  A Religious Organization shall re-verify that it meets the requirements in paragraph E3.1.2., above, if chaplains endorsed by it are unable to gain re-endorsement at times of change of career status.

E3.1.7.  Religious Organizations that are currently able to endorse RMPs for Military Service as chaplains under earlier versions of this Instruction may continue to endorse RMPs as long as they continue to meet the requirements in effect when they originally began to endorse RMPs for the military chaplaincies. Such organizations shall affirm in writing to the AFCB by January 31st of each year that they continue to meet such requirements.  This provision applies equally to Religious Organizations that endorse chaplains directly to the Department of Defense through an embedded endorsing organization; Religious Organizations that, under previous versions of this Instruction, were extended the privileges of endorsing chaplains through representation by external endorsing organizations; and larger organizations that have acted on behalf of member Religious Organizations.

E3.1.8.  By January 31st of each year, each Religious Organization shall provide to the AFCB a complete list of Chaplains endorsed for military chaplaincy.  Chaplains shall be listed alphabetically by name and Military Department.

E3.1.9.  In accordance with DoD Directive 5120.8 (reference (h)), the AFCB shall inform Religious Organizations that endorse Chaplains that they no longer meet the administrative requirements of paragraphs E3.1.2. through E3.1.5., above, and may no longer endorse Chaplains for Military Service.  Before taking such action, the AFCB shall give written notice stating the reasons for lack of compliance and shall allow the Religious Organization concerned a reasonable opportunity to provide a written reply that shall be carefully considered in making a final decision.  Review of administrative compliance may be initiated if the Religious Organization fails to respond to requests by endorsed chaplains for assistance or re-endorsement at times of change of career status or if the AFCB cannot contact the Religious Organization in a reasonable period of time.  Religious Organizations informed that they may no longer endorse chaplains due to lack of administrative compliance may resubmit their required documents.  The AFCB shall not review the compliance of a Religious Organization with reference (a) and this Instruction again until the Religious Organization completes all administrative requirements.  If a Religious Organization is no longer able to endorse chaplains under this Instruction, all ecclesiastical endorsements issued by that Organization shall be considered withdrawn.  Serving chaplains endorsed by that Organization shall be considered to have had their endorsements revoked (paragraph 6.5. applies).

*DODI 1304.28, June 11, 2004*

E4.  ENCLOSURE 4

FORMAT FOR PROVIDING REQUIRED INFORMATION TO MEET ADMINISTRATIVE REQUIREMENTS TO ENDORSE CHAPLAINS TO THE MILITARY DEPARTMENTS

E4.1.1.  Religious Organizations desiring to endorse RMPs to the military to serve as military chaplains shall forward written notification of such intent to the AFCB in accordance with paragraph E3.1.2., above.

E4.1.1.1.  The written notification may be submitted through traditional hard copy or secure electronic means with verifiable signature.

E4.1.1.2.  The written notification shall be submitted on organization letterhead or from an official electronic account capable of secure electronic signature.

E4.1.1.3.  The written notification shall include, at a minimum, a statement that meets the requirements of paragraph E3.1.3. and provides the following information in the following order:

E4.1.1.3.1.  Name of organization.

E4.1.1.3.2.  Address of organization.

E4.1.1.3.3.  Name, address, telephonic, and electronic contact for endorsing official.

E4.1.1.3.4.  Statement verifying ability of the designated endorsing official to endorse and withdraw endorsement of candidates and Chaplains.

E4.1.1.3.5.  Statement verifying the Religious Organization shall immediately notify the AFCB when changes occur in the status of the organization, designated endorsing agents, or the contact addresses and telephone numbers of either.

E4.1.1.3.6.  Signature of responsible official with authority to make such statements on behalf of the organization.

E4.1.1.4.  The written statement shall include as enclosures verification of current status as an IRS Section 501(c)(3) exempt organization in accordance with subparagraph E3.1.3.1., above, the Employer Identification Number assigned to the organization by the IRS, and all other enclosures to support this status.

*DODI 1304.28, June 11, 2004*

E5.  ENCLOSURE 5

FORMAT FOR PROVIDING REQUIRED INFORMATION TO ENDORSE RMPS AS CHAPLAINS TO THE MILITARY DEPARTMENTS

E5.1.1.  Religious Organizations submitting required documentation of their first fully qualified RMP to a specific Military Department shall forward the applicant's documentation in accordance with paragraph 6.1. of this Instruction.  The written documentation shall, at a minimum include:

E5.1.1.1.  Application for Appointment:  DA Form 61; AF Form 24/Addendum; Navy:  NC1100/11.

E5.1.1.2.  Application for Active Duty: DA Form 160; AF Form 125, EAD Application (AF Reserve/Guard; Navy Reserve Recall:  NP1131/5.

E5.1.1.3.  Application Letter requesting Appointment by applicant; (Navy: include in form of applicant "Motivational Statement" if not included in NC1100/11).

E5.1.1.4.  Official copy of each Undergraduate and Graduate Transcript.

E5.1.1.5.  Statement verifying date of latest National Agency Check or check in progress; SF Form 86, Questionnaire for Security Positions.

E5.1.1.6.  Standard Form 88 (Navy: DD2808), Report of Medical Examination and SF Form 93- Report of Medical History (Certified true copies; Navy:  DD2807-1); DD Form 2807-2 Medical Pre-screen-AF.

E5.1.1.7.  DD Form 368 Conditional Release.

E5.1.1.8.  All OPRs/OMPF microfiche or copies of DD Form 214, NGB Form 22, OERs, etc.

E5.1.1.9.  Official Photograph; or full body photo.

E5.1.1.10.  Birth Certificate and Driver's license.

E5.1.1.11.  Credit Check AETC Form 1325-AF.

E5.1.1.12.  Chaplain Interview-Army, Navy:  NC1100/13; 3 to 5 Letters of Recommendation-AF; Navy:  minimum of 3 letters.

*DODI 1304.28, June 11, 2004*

E5.1.1.13.  Family Member Information Document (Typed on plain bond paper; Biography/Resume).

E5.1.1.14.  Certificate of Ecclesiastical Endorsement; Ordination Certificate.

*DODI 1304.28, June 11, 2004*

## E6.  ENCLOSURE 6

## DD FORM 2088, "STATEMENT OF ECCLESIASTICAL ENDORSEMENT"

| STATEMENT OF ECCLESIASTICAL ENDORSEMENT | Form Approved<br>OMB Number 0704-0190<br>Expires Feb 28, 2006 |
|---|---|

The public reporting burden for this collection of information is estimated to average 45 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services and Communications Directorate (0704-0190). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO CHIEF OF CHAPLAINS (ITEM 2).**

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10, U.S. Code, Sections 532 and 12201; EO 9397.

**PRINCIPAL PURPOSE(S):** To verify the professional and ecclesiastical qualifications of Religious Ministry Professionals for initial appointment or chaplains change of career status appointments as chaplains in the Military Service. This form is an essential element of a chaplain's professional qualifications and will become part of a chaplain's military personnel record.

**ROUTINE USE(S):** None.

**DISCLOSURE:** Voluntary; however, failure to provide all the information requested may significantly delay the processing of this endorsement.

**1. FROM**

| a. TYPED OR PRINTED NAME OF RELIGIOUS ORGANIZATION GRANTING RELIGIOUS MINISTRY PROFESSIONAL ENDORSEMENT<br><br>Ecclesiastical Fellowship of Worshippers | b. DATE OF CURRENT INTERNAL REVENUE CODE (IRC) 501(c)(3) EXEMPT STATUS<br>January 1, 1990 | c. EMPLOYER IDENTIFICATION NUMBER (IRC)<br>39-1234567 |
|---|---|---|
| | d. TELEPHONE (Include Area Code)<br>200-111-2222 | e. FAX NUMBER (Include Area Code)<br>200-111-3333 |

| f. ADDRESS. (1) STREET (Include apartment or suite number)<br>123 Main Street | (2) CITY<br>Anytown | (3) STATE<br>OH | (4) ZIP CODE<br>40005 |
|---|---|---|---|

| g. E-MAIL ADDRESS<br>fellows@lifthands.net | h. WEB SITE<br>www.lifthands.net |
|---|---|

**2. TO**

| a. CHIEF OF CHAPLAINS (X appropriate block) | X (1) ARMY | b. ADDRESS. (1) STREET (Include apartment or suite number)<br>2511 Jefferson Davis Hwy, Suite 12500 Presidential Towers | | |
|---|---|---|---|---|
| | (2) NAVY | (2) CITY<br>Arlington | (3) STATE<br>VA | (4) ZIP CODE<br>22202-3907 |
| | (3) AIR FORCE | | | |

**3. APPLICANT INFORMATION.**   a. IS THIS AN INITIAL ENDORSEMENT? (X one)    X  YES    NO

| b. TYPED OR PRINTED NAME (Last, First, Middle Initial)<br>Chaplain, Wannabee A. | c. SSN<br>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 | d. TELEPHONE (Include Area Code)<br>300-222-3333 |
|---|---|---|

| e. ADDRESS. (1) STREET (Include apartment or suite number)<br>2004 Oak Street | (2) CITY<br>West Lake | (3) STATE<br>VA | (4) ZIP CODE<br>24444 |
|---|---|---|---|

| f. E-MAIL ADDRESS   wannabee@cxnet.org |
|---|

| g. NUMBER OF YEARS OF PROFESSIONAL MINISTRY EXPERIENCE APPLICANT HAS COMPLETED<br>3 | h. NUMBER OF MONTHS OF PRIOR ACTIVE MILITARY SERVICE APPLICANT HAS COMPLETED |  |
|---|---|---|
| | (1) OFFICER   0 | (2) ENLISTED   4 |

| i. APPLICATION IS FOR (X one) | (1) RESERVE (Non-Active Duty) | (4) EXTENDED ACTIVE DUTY (Indefinite) |
|---|---|---|
| | X (2) NATIONAL GUARD | (5) REGULAR COMMISSIONED OFFICER |
| | (3) INITIAL ACTIVE DUTY (3 years) | (6) RESERVE (AGR) |

**4. ECCLESIASTICAL ENDORSING AGENT**

a. AS THE ECCLESIASTICAL ENDORSING AGENT AUTHORIZED TO REPRESENT   Ecclesiastical Fellowship of Worshippers ,
*(Name of religious organization) Item 1*

I HEREBY VERIFY THE ABOVE APPLICANT TO BE PROFESSIONALLY QUALIFIED AS A RELIGIOUS MINISTRY PROFESSIONAL FOR THE MILITARY CHAPLAINCY.

| b. TYPED OR PRINTED NAME (Last, First, Middle Initial)<br>Scott, Barney T. | c. E-MAIL ADDRESS<br>btscott@lifthands.net | | |
|---|---|---|---|

| d. ADDRESS. (1) STREET (Include apartment or suite number)<br>9876 White House Lane | (2) CITY<br>Sometown | (3) STATE<br>GA | (4) ZIP CODE<br>30005 |
|---|---|---|---|

| e. TELEPHONE (Include Area Code)<br>400-444-5555 | f. FAX NUMBER (Include Area Code)<br>400-444-4444 | g. SIGNATURE | h. DATE SIGNED (YYYYMMDD)<br>20040331 |
|---|---|---|---|

**5. COMMENTS**

Applicant is a Phi Beta Kappa, graduated cum laude and is an All-American track star. Exceptional ability and leadership skills.

**DD FORM 2088, MAR 2004**          PREVIOUS EDITION IS OBSOLETE.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHAPLAINCY OF FULL GOSPEL CHURCHES, | ) | |
| | ) | |
| v. | ) | Case Number 1: 99CV002945 (RMU) |
| | ) | |
| THE HON. GORDON R. ENGLAND, et al. | ) | |
| | ) | **Consolidated with** |
| ROBERT H. ADAIR, et al., | ) | |
| | ) | |
| v. | ) | Case Number 1: 00CV00566 (RMU) |
| | ) | |
| THE HON. GORDON R. ENGLAND, et al. | ) | |
| | ) | |

## <u>DECLARATION OF KLON K. KITCHEN JR.</u>

Pursuant to 28 U.S.C. § 1746, I, KLON K. KITCHEN JR. declare as follows:

1.      I live at 107 Falcon Dr., Richmond Hill, GA 31324. I am competent to testify on and have personal knowledge of the matters addressed or discussed in this Declaration.

2.       I am an Army chaplain at the grade of Captain, currently assigned to Fort Stewart, GA.  I have recently been selected for promotion to the rank of Major (O-4).

3.       Prior to becoming an Army chaplain, I was a Navy chaplain until I was separated after being twice not selected for promotion to Lieutenant Commander (LCDR).  I am a plaintiff in the Chaplaincy of Full Gospel Churches lawsuit and this declaration addresses an incident that occurred during my time as a Navy chaplain.

4.       Around May of 1996, I was assigned to Marine Air Group (MAG) 31 at Beaufort, S.C.

5.       I was present at a luncheon with Chaplain (Captain) Wayne Bumbry from the 2D Marine Air Wing and Chaplain (Commander) Norman Brown, the MAG 31 senior chaplain, and Chaplain (LCDR) Dave Gibson, also of MAG 31.

06cv1699
EXHIBIT 7

6.      During this luncheon, Chaplain Bumbry said that he had recently sat on a Chaplain Captain selection board and that at the end of the board they realized that they had not selected any Catholics for Captain.  He told us that the board members had to reconvene in order to pick a Catholic and deselected a Protestant to do so, i.e., took someone off the list that had already been selected.

7.      I remember this distinctly because having been twice passed over (not selected) to Lieutenant Commander I was on my way out of the Navy, this was my last month on active duty, and I was upset that a promotion board would deselect someone merely to make sure they had a Catholic selectee.

        I make this declaration under the penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.


Dated: January 16, 2002                    _____/S/_____
                                           KLON K. KITCHEN, JR.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHAPLAINCY OF FULL GOSPEL CHURCHES)
                                   )
            Plaintiff              )
            V.                     )
                                   )
THE HONORABLE RICHARD J.DANZIG,.   )        Civil Action NO.  1:99CV02945
                                   )
            et al.,                )
                                   )

**Affidavit of Floyd Cedric Ellison**

1.  May name is Floyd Cedric Ellison.  I was born March 28, 1937 and reside at 535 "J." Street, Chula Vista, California, 91910.  I have personal knowledge of and am competent to testify concerning the information presented in this affidavit.

2.  I completed my undergraduate education at Augustana College in Rock Island, Illinois in June, 1959.  My Master of Divinity in May of 1963, the Master of Religious Education, June 1971, and the Doctor of Ministry in June of 1981were degrees each completed with the American Baptist seminary of the West located in Berkeley California.

3.  After I was endorsed by the American Baptist Churches, I was commissioned as a chaplain on March 22, 1972, and entered active duty in the Navy on February 1, 1974.

4.  I was selected for early retirement by the Selective Early Retirement Board (SERB) for FY 1997, and I was separated (retired) from the Navy on August 1, 1997

06cv1696
EXHIBIT 8

Affidavit of Floyd Cedric Ellison
Page 2 of 3

5.   During June of 1996 I turned over the position of Command (Senior) Chaplain, Naval

Construction Battalion Center, Port Hueneme, California to the new incoming Command Chaplain,

Captain Jim Anderson.  Captain Anderson had just that previous February 1996, set on the Chaplain

Corps Captain selection board as one of its five Board members.  He was the only Catholic chaplain on

the board.  Traditionally there was always a minimum of one priest on each board.

6.   During Chaplain Anderson's and my turnover process, Chaplain Anderson described an event

which he said occurred during the FY 97 Captain Selection Board proceedings conducted earlier that

February of 1996.  He said that after the initial votes were cast, not one Catholic chaplain had been

selected for Captain.  He mentioned his concern to the board, and a woman officer on the board told him,

"Well I am Catholic, and I know several of these Catholic chaplains; they're certainly not Captain

material!"   According to Chaplain Anderson,  the following day,  he again brought up the issue, and said

that there would be a hue-and-cry from the Catholic Military Archdiocese,  and they would never hear

the end of it, if at least on Catholic or not selected.  Chaplain Anderson, a Columban Order priest, then

brought out the record of fellow Franciscan Order priest, Lewis Iasiello, whom the board then voted on,

and in fact selected two years junior to the other selectees.  Chaplain Anderson did not mention any other

faith groups threatening retribution if there candidates were not selected during the board's proceedings.

7.   I turned over the position to Chaplain Anderson, and reported to Guam where the following

year I was selected for early retirement, effective August 1, 1997.

06cv1696
EXHIBIT 8

Affidavit of Floyd Cedric Ellison
Page 3 of 3

Under penalty of perjury, I affirm that the above information is true and correct to the best of my

ability and reflects the testimony I would give if called to testify in a court of law.

_____    /S/_____
                                                    Floyd Cedric Ellison

                                                    Captain, Chaplain Corps

                                                    U. S. Navy (retired)

Subscribed and sworn to before me this 31st day of January, 2000.

_____/S/____Haydee La Bounty____                   HAYDEE LA BOUNTY
Notary Public                                       NOTARY SEAL
My Commission expires:   11-2-2003_____

06cv1696
EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DAVID L. GIBSON, et al., | ) | |
| | ) | |
| v. | ) | Case No. 06cv1696 (RMU) |
| THE UNITED STATES NAVY, et al. | ) | |
| | ) | |

**[Proposed] ORDER**

Before the Court is plaintiffs' Motion for an Order under 28 U.S.C. § 1404(a) transferring this case to the Northern District of Florida where it was originally filed.  Based on the parties' pleadings and evidence, the Court finds that this case does not meet § 1404(a)'s criteria because it could not have been initially filed in the District of Columbia.  Accordingly, plaintiffs' Motion is GRANTED it is ORDERED that this case be transferred to the Northern District of Florida.

So ORDERED this _____ day of _____, 2007.


_____
RICARDO M. URBINA
United States District Judge